Terrance M. ALLEN,
Plaintiff/Appellant,

v.

Jerry SCRIBNER, Hans Van Nes, Olaf
Leifson, Gordon Tween, Robert Milam,
Richard Rominger, Lyndon Hawkins,
Robert Hobza, Robert V. Dowell,
Charles D. Hunter, and John Does 9
Thru 250, Defendants/Appellees.

No. 85–2125.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1986.

Decided March 5, 1987.

Stanley G. Hilton, Michael S. Sorgen, San Francisco, Cal., for plaintiff/appellant.

George Chris Stoll, San Francisco, Cal., Susan R. Oie, Sacramento, Cal., for defendants/appellees.

Before NELSON, CANBY and NOONAN, Circuit Judges.

NELSON, Circuit Judge:

Terrance Allen, an entomologist employed by the California Department of Food and Agriculture ("the Department"), filed an action for damages against the

Department, eight Department employees,[1] and two employees of the United States Department of Agriculture ("USDA"),[2] alleging violations of his civil rights under both 42 U.S.C. § 1983 and the first amendment of the Constitution.[3]

The gravamen of Allen's complaint is that he was removed from the Mediterranean Fruit Fly Eradication Project ("the Project") in Santa Clara County, reassigned to another position, and otherwise harassed in retaliation for, and in anticipation of, remarks he made to the press about an alleged breach of public trust by Project management. The district court granted summary judgment for the defendants after denying Allen's motion for change of venue. On appeal, Allen seeks reversal of both the summary judgment and the denial of his venue motion.

We reverse the summary judgment as to all of the defendants, affirm the denial of Allen's venue motion, and remand for further proceedings consistent with this opinion.

## FACTS

In June 1980, Mediterranean fruit flies were discovered in both Santa Clara and Los Angeles Counties. To combat this serious threat to California's agriculture industry, eradication programs were immediately established in both Northern and Southern California under the aegis of the Department, the USDA, and the two county agricultural commissioners. Allen was assigned to supervise the fruit collection/larvae detection section of the Santa Clara Project in July 1980.

On August 5, 1980, federal defendant Gordon Tween issued a memorandum prohibiting Project employees from talking to the media. In November 1980, Allen distributed to members of the Project's Technical Review Committee ("TRC") a report concluding that the medfly infestation was more extensive than Project officials had acknowledged in their statements to the press. Federal defendant Robert Milam learned of Allen's report at a November 20, 1980, meeting of the TRC, and allegedly issued to Allen a threat meant to keep the entomologist from airing any of his opinions publicly.[4] Nevertheless, in November and December of 1980, and in January of 1981, Allen told the news media that Project management "did not have a 'handle'" on the medfly infestation problem.

On December 18, 1980, Richard Rominger, Director of the California Department of Food and Agriculture ("CFDA"), appointed state defendant Jerry Scribner to take over leadership of the Project. Rominger and Scribner decided that the Project needed reorganizing to integrate the chain of command among federal and state employees. On December 21, 1980, Scribner implemented the reorganization plan he and Rominger had developed, taking Allen's collection section out of the trapping unit and elevating it to a separate unit reporting directly to Gordon Tween. By then, the medfly problem had become acute. Governor Edmund G. Brown, Jr., was about to proclaim a state of emergency in Santa Clara and Alameda Counties on December 24, 1980. On January 12, 1981, and again on January 14, Tween asked

1. Jerry Scribner, Hans Van Nes, Olaf Leifson, Richard Rominger, Lyndon Hawkins, Robert Hobza, Robert Dowell, and Charles Hunter.

2. Gordon Tween and Robert Milam.

3. Allen's third amended complaint also included causes of action under California law, but the defendants moved for dismissal, relying on *Miller v. DeLaune,* 602 F.2d 198, 200 (9th Cir.1979) (government official absolutely immune from state or common-law tort liability where "acting within the outer perimeter of his or her line of

duty"). Their motion was unopposed, and the causes of action were dismissed.

The entire lawsuit was originally dismissed by the district court pursuant to Fed.R.Civ.P. 41(b). However, this court affirmed in part, reversed in part and remanded to the district court for further proceedings. *Allen v. Scribner,* Nos. 83–1995 & 83–2182 (9th Cir. April 11, 1984) (unpublished memorandum).

4. Milam allegedly told Allen that he would spray Allen with pesticides and that he would "have [Allen's] head."

Allen to implement a new larvae surveillance system. Both times Allen refused to change his methodology. Also on January 12, 1981, Scribner allegedly told Allen to cancel a scheduled media interview and prohibited him from granting any further interviews. On January 15, 1981, Allen was removed from the collection unit. Upon being transferred to the Project's ground spray unit, Allen was given direct orders to stay away from the collection unit. However, on January 19, 1981, the new supervisor of the collection unit reported to Scribner that Allen had interfered with her efforts to give the crews their instructions that morning.

Scribner contacted Robert McCarry, the Personnel Officer for the Department in Sacramento, to inquire whether Allen could be transferred back to Sacramento. McCarry told him that personnel rules allowed management to assign employees according to the Department's needs so long as each employee's duties were commensurate with his classification. Scribner then informed Allen that he was transferring him back to Sacramento.

Allen contends that his new assignment consisted primarily of "trivial clerical tasks" and bore no relationship to his training and experience. He further alleges that he was the subject of continued harassment designed both to prevent him from voicing his opinion and to punish him for his having already done so. Specifically, his complaint asserts that: (i) all of the state defendants made defamatory statements to the media with the intent of discrediting him; (ii) state defendants Scribner, Hans Van Nes, Richard Rominger, and Lyndon Hawkins intimidated him in order to prevent him from testifying before the

California Senate Agricultural Committee; (iii) state defendants Olaf Liefson, Robert Hobza, Robert Dowell, and Charles Hunter threatened and harassed him between January and August of 1981; and (iv) one or more of the state defendants harassed him by confiscating his phone messages from the press.[5]

Allen filed suit in the United States District Court for the Northern District of California, seeking damages from the state defendants under 42 U.S.C. § 1983, and from the federal defendants directly under the first amendment of the Constitution.[6] He asserted that the defendants' actions caused him mental and physical harm, as well as damage to his reputation. On December 3, 1984, Allen filed a motion under 28 U.S.C. § 1404(a) seeking a transfer of venue to the Eastern District of California. On January 4, 1985, the trial judge denied the motion because "the bulk of the cause of action occurred in [the Northern District]," and because he was "quite familiar" with the case after some three and one-half years.[7] The defendants then filed motions for summary judgment. The district court granted those motions on May 3, 1985, and Allen timely filed his notice of appeal.

## ISSUES

I. Did Allen's remarks to the media fall outside the protection of the first amendment as a matter of law?

II. If Allen's remarks are not outside of first amendment protection, did undisputed facts show that he would have been transferred and harassed on the basis of his non-speech conduct anyway?

---

**5.** Allen makes no claim that either of the federal defendants took any action against him once he was transferred back to Sacramento.

**6.** A victim of federal misconduct may sue the responsible federal officials directly under the Constitution. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (authorizing action for damages under fourth amendment); *Gibson v. United States,* 781 F.2d 1334, 1341–42 (9th Cir.1986) (authorizing *Bivens*-type action under first amendment).

**7.** The court also invited the defendants to test the sufficiency of the complaint by motion, and scheduled a hearing for March 22, 1985. In the interim, Allen unsuccessfully petitioned this court for a writ of mandamus to clarify for the district court what colorable claim was contained in the federal cause of action of the third amended complaint. *See Allen v. United States District Court for the Northern District of California,* No. 85–7117 (9th Cir. April 23, 1985) (unpublished memorandum).

III. Were Scribner and the federal defendants entitled to summary judgment on the ground of qualified immunity?

IV. If this court decides to reverse the summary judgment, should it remand with instructions to grant Allen's motion for change of venue?

## STANDARD OF REVIEW

We review the district court's grant of a motion for summary judgment de novo. *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.1985). We view the evidence in the light most favorable to the party opposing the motion and accord that party's papers a liberal construction. *Id.; see also* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2738, at 484 (1983). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

We affirm only if there is an absence of any genuine issue of material fact and if the moving party is entitled to judgment as a matter of law. *Lew,* 754 F.2d at 1423. The Supreme Court has analogized the standard for summary judgment to that for a directed verdict and observed: "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson,* 106 S.Ct. at 2511. The Court also noted that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

■ We review the district court's denial of a motion to change venue for abuse of discretion. *Commodity Futures Trading*

*Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.1979).

## DISCUSSION

### I. Allen's Speech as Protected Expression

■ In evaluating the first amendment rights of a public employee, the threshold inquiry is whether the statements at issue address a matter of public concern.[8] As the Supreme Court has so often recognized, such speech occupies the "highest rung of the hierarchy of [f]irst [a]mendment values." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425–26, 73 L.Ed.2d 1215 (1982); *see also Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293–94, 65 L.Ed.2d 263 (1980). It is "more than self-expression; it is the essence of self-government," worthy of special protection. *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964); *see also Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964).

The Court has not articulated a precise definition of "public concern," however. It has allowed only that the determination of whether an employee's speech deals with such an issue is to be made with reference to "the content, form, and context" of the speech. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. In *Pickering v. Board of Education,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968), the Court determined that a high school teacher's open criticism of the school board for its allocation of funds between athletics and education, and for its methods of informing taxpayers about revenue needs, addressed "a matter of legitimate 'public concern.' "[9] In *Connick v. Myers,* 461

---

8. Because it is an inquiry of law rather than fact, *see Connick v. Myers,* 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 1690 n. 7, 1692 n. 10, 75 L.Ed.2d 708 (1983), our standard of review is de novo. *See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc) ("conclu-sions of law are subject to ... de novo review"), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

9. The Court has also characterized as addressing matters of "public concern" a junior college professor's open disagreement with his Board of

U.S. at 148, 103 S.Ct. at 1690, questions posed by an assistant district attorney to her co-workers about (i) their confidence and trust in certain supervisors, (ii) the level of office morale, and (iii) the need for a grievance committee, did not "fall under the rubric of matters of public concern." This court has synthesized these holdings as follows:

> Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. *See Connick.* On the other hand, speech that concerns "issues about which information is needed or appropriate to enable the members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection. *Thornhill v. Alabama,* 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093] (1940) (footnote omitted).

*McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983).

■ The state defendants contend that Allen's public criticism of the Project, particularly his criticism of management's communications regarding the extent of the medfly infestation, did not involve "government policy." Insofar as the state defendants mean to suggest that Allen's speech did not address a "matter of public concern," they are incorrect. In *McKinley v. City of Eloy,* 705 F.2d at 1114–15, this court had "no difficulty" deciding that a probationary police officer's criticism of the city for its failure to grant annual pay raises to the police force "substantially involve[d] matters of public concern."

Just as the speech in *McKinley* was "purposefully directed to the public," *id.* at 1115, and related to the "competency of the police force," *id.* at 1114, as well as " 'the efficient performance of [police] duties,' " *id.* (quoting *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691), so too was Allen's speech directed to the public,[10] and related to the competency of Project management as well as the efficient performance of Project duties. Indeed, Allen's speech may rest more firmly on the "highest rung of the hierarchy of [f]irst [a]mendment values," *Claiborne Hardware,* 458 U.S. at 913, 102 S.Ct. at 3425, because it "bring[s] to light a[n alleged] breach of public trust on the part of [public officials]." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691. Such allegations are arguably the most fundamental sort of first amendment expression, given the first amendment's role in facilitating self-government. *See id.* at 161, 103 S.Ct. at 1697–98 (Brennan, J., dissenting) ("We have long recognized that one of the central purposes of the [f]irst [a]mendment ... is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government.") (citing *Mills v. Alabama,* 384 U.S. at 218–19, 86 S.Ct. at 1436–37; *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964); A. Meiklejohn, *Free Speech and Its Relation to Self-Government* 22–27 (1948)); *see also Saxbe v. Washington Post Co.,* 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting) ("No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability

---

Regents about whether the school should be elevated to four-year status, *see Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 (citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)), a public school teacher's open criticism of his principal's memorandum relating to teacher dress and appearance, *see id.* at 146, 103 S.Ct. at 1689–90 (citing *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)), and a public school teacher's private communication of charges that his school district's policies were racially discriminatory, *see id.* (citing *Givhan v.*

*Western Line Consolidated School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)).

**10.** Not all of Allen's speech was directed to the general public. In his third amended complaint, Allen notes that he spoke to several Project employees "regarding the status of the ... Project and the extent of [the] ... [m]edfly infestation." Nevertheless, since Allen may have suffered his alleged harm solely because of the speech directed to the general public, the analysis in the accompanying text still applies.

of our people through free and open debate to consider and resolve their own destiny.").

■ Of course, even speech dealing with matters of public concern is subject to governmental regulation. *See Cox v. Louisiana,* 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965) (time, place, and manner regulations proper when reasonably related to valid public interest). In the public employment context, "[t]he problem ... is to arrive at a balance between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. Thus, the Court upheld the firing of the assistant district attorney in *Connick*—even though one of her questions to fellow workers "touched" upon a matter of public concern—because it was reasonable for her supervisor to have believed that the speech would "disrupt the office, undermine his authority, and destroy close working relationships." 461 U.S. at 154, 103 S.Ct. at 1694.[11] Yet it might have been necessary, cautioned the majority, for the government to make "a stronger showing" of disruption "if the employee's speech [had] more substantially involved matters of public concern." *Id.* at 152, 103 S.Ct. at 1692–93.[12]

Exactly what that "stronger showing" entails is unclear. The Supreme Court has

deemed it both inappropriate and unfeasible to lay down a general standard "[b]ecause of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal." *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735; *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694. In this circuit, a police department ordinarily will not be governed by the same standard as a school district: "Substantial differences between the public interest in education and the public interest in safety and order justify a difference in the standards by which the respective institutions may protect themselves from ... their employees." *Byrd v. Gain,* 558 F.2d 553, 554 (9th Cir.1977) (refusing to expunge reprimands from personnel files of officers who had issued public statements about the police department's stop-and-frisk tactics), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *see also Kannisto v. City of San Francisco,* 541 F.2d 841 (9th Cir.1976) (discussed *supra* note 12), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977). Yet even in a police department, the complained-of disruption must be "real, [and] not imagined." *McKinley,* 705 F.2d at 1115. The disruption exception cannot "serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." *Id.*

In *Phillips v. Adult Probation Dep't,* 491 F.2d 951 (9th Cir.1974) which upheld the suspension of a probation officer who

---

**11.** In *Pickering,* the Court noted that "significantly different considerations would be involved" where "the relationship between superior and subordinate [wa]s of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the[ir] working relationship." 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3.

**12.** The majority emphasized that the speech at issue "touched upon matters of public concern in only a most limited sense;" it dealt primarily with a personal "grievance concerning internal office policy," 461 U.S. at 154, 103 S.Ct. at 1694, and was not aired publicly, *id.* at 153, 103 S.Ct. at 1693. In this regard, the defendants' reliance upon *Kannisto v. City of San Francisco,* 541 F.2d 841 (9th Cir.1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977), is somewhat

misplaced. In *Kannisto,* a police lieutenant was suspended for making disrespectful and disparaging remarks about a superior officer. During a morning inspection, the lieutenant told his own men that the superior officer was an "unreasonable, contrary, vindictive individual" whose behavior was "unreasonable, belligerent, arrogant, contrary and unpleasant." 541 F.2d at 842. The court "quer[ied] whether the information was 'vital to informed decision-making' by those legitimately concerned with the department's operations." *Id.* at 844 (quoting *Pickering,* 391 U.S. at 572, 88 S.Ct. at 1736). Further, mindful of the context in which the lieutenant made his remarks, the court determined that he had exercised his asserted rights, "not as a member of the general public, as in *Pickering,* ... but as an officer of the department." *Id.*

had refused to remove a political poster from his office, the government's allegation of disruption was well documented:

> The clerk typist and receptionist ... stated that the poster was disruptive to her [work], and she would not do any more typing for [the officer]. Two others stated that the poster made them 'extremely upset' and 'extremely angry,' one of them (a senior ... officer) stating further that it was a 'detrimental morale factor.' Another senior ... officer stated that ... the poster personally offended him and that unless it was removed 'a problem would arise within the department since other[s] ... were also offended by the poster.'

*Id.* at 953 n. 4. The supervisor testified that "if [he had] not take[n] immediate action, ... morale would have been devastat[ed] at a time when tremendously heavy case loads impose[d] a severe burden upon [the] staff." *Id.* at 953.

■ Here, the defendants have put forth no explanation of how Allen's statements to the media impeded his ability to perform his job or interfered with the Project's public responsibilities. *Cf. Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692–93.[13] To be sure, the medfly infestation represented a serious threat to California's agriculture industry. Other agricultural states, as well as Japan, were poised to quarantine California produce. Yet the very seriousness of the threat underlines the importance of speech meant to inform the public of mismanagement on the part of those entrusted to contain the threat. Thus, the defendants' invocation of the threat should not be enough to justify their alleged restriction of speech. If the efficient functioning of the eradication program necessitated police-type discipline, then the defend-

ants must explain why. If the defendants judged Allen's speech to be a disturbance to the Project's work, then they must be held at least to an assertion of the basis upon which that judgment rested.[14] The district court erred in concluding that all adverse action against Allen was justified because of the nature and context of his statements to the media. Accordingly, we proceed to a discussion of whether Allen would have suffered his alleged harm even had he not engaged in his protected speech.

## II. Allen's Protected Expression as the Predicate for His Alleged Harm

■ The district court concluded that Allen's "exercise of his [f]irst [a]mendment rights played no part in the acts complained of and that the same transfer decisions would have been made even if [he] had not exercised those rights." In *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), the Supreme Court noted that it is the public employee's burden to show that his constitutionally protected expression was a "substantial" or "motivating" factor in the employer's adverse decision or conduct. Once the employee satisfies his burden, the employer must show that it would have reached the same decision or that it would have engaged in the same conduct even in the absence of the protected expression. The Court reasoned that "[a] rule of causation which focuses solely on whether protected [expression] played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Id.* at 285, 97 S.Ct. at 575.[15]

13. The defendants may not, at this time, rely upon the disruption caused by Allen's non-speech activity. For purposes of summary judgment, the possibility remains open that Allen would not have been transferred but for his statements to the media. *See infra* § II. Further, some of the harassment he suffered was clearly linked to those statements. *See id.* Accordingly, it is not enough for the defendants simply to say that Allen was disruptive. They must demonstrate that his statements to the media were disruptive.

14. This is not to say that a public employer's judgment in such matters does not deserve "a wide degree of deference." *Connick*, 461 U.S. at 152, 103 S.Ct. at 1693. The point is simply that the employer must articulate the reasons for that judgment such that a court may evaluate it, deferentially or otherwise.

15. *Mt. Healthy* involved a school board's refusal to renew a teacher's contract. The Court's rationale applies just as well to an evaluation of

■ Viewed in the light most favorable to the nonmoving party, the evidence indicates that Allen's protected expression was a "substantial" factor in both his transfer [16] and his harassment.[17] The affidavits of two co-workers bear directly on the issue of Allen's transfer, and suggest that his expressive activity motivated the

other conduct adverse to the employee's interests.

16. "[A] transfer traceable to speech-related activity is properly the subject of first amendment challenge, even though the transfer result[s] in no loss of pay, seniority, or other benefit." *Hughes v. Whitmer*, 714 F.2d 1407, 1421 (8th Cir.1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *see also Simpson v. Weeks*, 570 F.2d 240, 241–42 (8th Cir.1978) (affirming judgment for policeman who was transferred and given negative evaluations in retaliation for constitutionally protected expression), *cert. denied*, 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979). In Judge Noonan's view, Allen has failed to allege a constitutional injury because "nothing [Allen] has offered goes to show [that] Scribner was responsible for assigning him" the allegedly trivial and clerical tasks he was made to perform in his new job. That Scribner (or Tween or Rominger) did not actually assign the work should not be dispositive, however. Even if the tasks Allen was made to perform were commensurate with his training and experience, they were significantly different from the field work he had been performing while on the Project, and Scribner, Tween, and Rominger certainly knew that would be the case. If Allen reasonably felt that office work was less desirable than field work, his reassignment might have had an impermissible chilling effect on his constitutionally protected speech.

In *McGill v. Board of Education*, 602 F.2d 774 (7th Cir.1979), a school teacher brought a § 1983 action against the Board of Education, its seven members, a school superintendant, and the school principal, alleging that she was involuntarily transferred to another school in retaliation for constitutionally protected speech. The district court entered judgment for the teacher pursuant to a jury verdict. On appeal, the Seventh Circuit affirmed as to all the defendants, holding that a transfer itself can be "an effective means of chilling constitutionally protected speech." *Id.* at 780. That the teacher's objections to the transfer may have "stemmed from her perceptions of the professional advantages at the [school where she had taught] or from more personal concerns" was of no consequence to the court, given that the transfer itself was "likely to [have] chill[ed] the exercise of [first amendment expression]." *Id.* In that regard, we cannot know, on an appeal from summary judgment, how much more Allen would have exercised his first amendment rights had he not been involuntarily transferred.

transfer. In his affidavit of February 18, 1983, Michael Arciero stated:

> In November 1980, a number of ... USDA [P]roject officials made comments to me that ... Allen should be removed from the ... [P]roject because of the way in which he expressed his opinions

17. Judge Noonan asserts that the alleged harassment did not rise to the level of a constitutional tort. While the individual incidents of verbal intimidation and abuse may seem insubstantial, we cannot say as a matter of law that the exercise of first amendment rights was not deterred. Allen has alleged "an entire campaign of harassment which though trivial in detail may have been substantial in gross. It is a question of fact whether the campaign reached the threshold of actionability under section 1983." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (reversing summary judgment against government employee who claimed that harassment was designed to punish her for having exercised her first amendment rights); *see also Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir.) ("Where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse ... action will follow the failure to accede to the official's request [that the employee curtail his first amendment rights], a valid claim can be stated."), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983).

The state defendants further argue that any allegation of harassment grounded in a claim of defamation is precluded by the Supreme Court's holding in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The plaintiff in that case brought a § 1983 action, claiming that the defamatory actions of the government would impair his future employment opportunities. The Court held that an "interest in reputation alone" is not a "liberty" or "property" interest recognized by state or federal law sufficient to invoke the procedural protection of the Due Process Clause; accordingly, to establish a claim under § 1983, more must be involved than defamation by a state official. *See* 424 U.S. at 701–10, 96 S.Ct. at 1160–65. Here, something more *is* involved. Allen alleges that the defamation he suffered was part of a concerted effort to burden his first amendment expression. As the Court observed in *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978), when an injury is caused by a constitutional violation, that injury is compensable under § 1983. *See Anderson v. Central Point School Dist. No. 6*, 746 F.2d 505, 508 (9th Cir.1984) (affirming award of damages for a § 1983 plaintiff defamed in retaliation for his exercise of first amendment rights); *see also Crawford v. Garnier*, 719 F.2d 1317, 1324 (7th Cir.1983) (upholding award for injury to reputation in § 1983 action).

concerning the degree of ... infestation. These officials disagreed with him on his opinions, and felt that he should be removed. They called [Allen] a "troublemaker."

And in her July 20, 1982 affidavit, Cynthia Watts swore to the following:

Gordon Tween told me that he had been instructed by several [s]tate and/or [f]ederal officials to remove Allen from his duties of fruit collecting. Tween told me that these officials wanted to have Allen removed from the Project and were looking for an excuse to remove ... Allen ... from the Project entirely, so they ... told ... Tween ... to remove Allen from his duties on the basis of a "disagreement" on the use of maps.[18]

[10] Whether Allen would have been transferred *notwithstanding* his first amendment expression is "a genuine issue of material fact," Fed.R.Civ.P. 56(c), and is therefore inappropriate for summary judgment. The evidence put forth by the defendants is definitive only in establishing that Allen *could* have been transferred off the collection unit and back to Sacramento

because of his non-protected activity (*i.e.*, his refusal to obey orders), and not that he *would* have been transferred. In *Mt. Healthy,* as noted above, the Court opined that the government's burden is to show that "it *would* have reached the same decision as to [the plaintiffs'] employment even in the absence of the protected [expression]." 429 U.S. at 287, 97 S.Ct. at 576 (emphasis added). That Allen's insubordinate conduct might have justified an adverse employment decision, including a transfer, does not suffice. The employee in *Mt. Healthy* was a nontenured high school teacher who *"could* have been discharged for no reason whatever." *Id.* at 283, 97 S.Ct. at 574 (emphasis added). Yet the case was remanded so that the district court might determine whether the teacher *would* have been discharged.

With respect to the alleged harassment, the defendants do not attempt to argue that they would have accorded Allen the same treatment even if he had not engaged in protected expression. Much of the harassment was allegedly meted out in the

---

**18.** In view of these affidavits and other inferences that can be drawn from the record, we disagree with Judge Noonan's assertion that the allegations concerning Tween's and Rominger's roles in the transfer were unsupported by any evidence.

Judge Noonan points out that the affidavits contain hearsay against the unnamed project officials. However, as Judge Noonan recognizes, defendants made no motion to strike the affidavits below. If a party fails to move to strike an affidavit that is allegedly defective under Rule 56(e), he waives any objection to it. *See Bieghler v. Kleppe,* 633 F.2d 531, 533 (9th Cir.1980); *Scharf v. United States Attorney General,* 597 F.2d 1240, 1243 (9th Cir.1979); *see also In re Teltronics Servs.,* 762 F.2d 185, 192 (2d Cir.1985); *Lacey v. Lumber Mutual Fire Ins. Co.,* 554 F.2d 1204, 1205 (1st Cir.1977); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2738, at 507–09 (1983) ("A party must move to strike an affidavit that violates Rule 56(e); if he fails to do so, he will waive his objection and, in the absence of 'a gross miscarriage of justice,' the court may consider the defective affidavit.").

Rominger may be one of the project officials to whom the affidavit refers. As Director of the CFDA, he originally initiated a reorganization of the Project during the period immediately following Allen's first statements to the press. He worked together with Scribner to reorganize the

Project and to elevate Allen's collection section to a separate unit reporting directly to Gordon Tween, whose earlier memorandum indicated his endorsement of a restrictive media contact policy. The proximity in time between Allen's first statements to the press (November and December 1980) and Rominger's reorganization of the Project with Scribner (December 18–21, 1980), and between the reorganization, Allen's subsequent statements to the press (January 1981), and Allen's transfer out of collection and, later, back to Sacramento (January 15 and 19, 1981, respectively), all appear to permit an inference that Rominger may have played a part in Allen's transfer. We cannot say, at this stage, that a jury could not reasonably infer a nexus between Rominger and the transfer based upon the temporal sequence of events, Rominger's active participation in supervising and reorganizing the Project, and the affidavits.

Tween was mentioned by name in the Watts affidavit. He was the official to whom Allen directly reported. Scribner, in his declaration, stated that he arbitrated several disputes between Tween and Allen and that Tween informed him he could no longer work with Allen. Construing the evidence in the light most favorable to Allen, we cannot, on this appeal from a summary judgment, conclude that Rominger and Tween were not partly responsible for Allen's transfer.

context of, or by disparaging remarks about, Allen's statements to the media.

## III. Immunity for Scribner and the Federal Defendants

The district court relied upon *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), in concluding that state defendant Scribner and federal defendants Milam and Tween are immune from liability.[19] *Harlow* shields governmental officials performing discretionary functions from civil liability insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738 (citing *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975)).[20]

■■■■■ In 1980, government employees had a clearly established constitutional right to inform the public of significant mismanagement of a public project when no substantial disruption of the project would result. Inasmuch as the defendants' interest in preventing the substantial disruption of the eradication program *may* have been served by restrictions on the free speech rights of Project employees (*see supra* § 1), we are not in a position to determine whether the above named defendants violated "clearly established constitutional rights." If, for example, Allen's speech did appear to threaten the Project's efficient operation, then the defendants probably are entitled to immunity. If, on the other hand, it appeared clearly unlikely that Allen's speech would disrupt the Project's work and the defendants acted against Allen because of his speech, then the defendants are not entitled to immunity. As a matter of law, they would have violated Allen's clear constitutional right. *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Of course, if they acted for other reasons— *e.g.*, because of Allen's insubordination or lack of cooperation in the field—they have no liability. A jury must decide the issue of motivation.[21]

## IV. Transfer of Venue

■■■■ Allen asked the district court to transfer venue to the Eastern District of California "[f]or the convenience of parties and witnesses, [and] in the interest of justice," 28 U.S.C. § 1404(a). He claimed that most of the witnesses whom he intended to call resided in the Eastern District. The district court denied Allen's motion, concluding that the bulk of the cause of action had occurred in the Northern District, and that the court's familiarity with the case after three and one-half years counseled against a change of venue.

Because the transfer of this case undoubtedly would have led to delay, the district court did not abuse its discretion in denying Allen's motion notwithstanding possible inconvenience to the witnesses. *See Moore v. Telfon Communications Corp.*, 589 F.2d 959, 968 (9th Cir.1978) (convenience of witnesses outweighed by consideration of duration of pendency of litiga-

---

**19.** Qualified immunity "is an affirmative defense that must be pleaded by [the] defendant official." *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736 (citing *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). Here, only the above-named defendants pleaded immunity.

**20.** *Harlow* involved constitutional and statutory claims against federal officials. The same standard of immunity also applies in § 1983 suits brought against state officials. *See Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909–10, 57 L.Ed.2d 895 (1978).

**21.** Allen contends that the above-named defendants are not entitled to immunity because they are not "officials at the highest levels of govern-

ment." We find no support for that proposition in the case law, however. The immunity defense also may be asserted by other governmental officials to protect the exercise of their discretion. *See, e.g., Procunier*, 434 U.S. at 556, 561, 98 S.Ct. at 857, 859 ("subordinate" and "supervisory" officials at state prison); *O'Connor v. Donaldson*, 422 U.S. 563, 576–77, 95 S.Ct. 2486, 2494–95, 45 L.Ed.2d 396 (1975) (superintendent of state hospital); *Wood*, 420 U.S. at 319, 95 S.Ct. at 999 (school board members). And here, the record reflects that these defendants performed discretionary functions: Jerry Scribner was the acknowledged leader of the Santa Clara Project; Gordon Tween was the head of the Project's detection and release unit; and Robert Milam was a member of the TRC.

tion); *see also CFTC v. Savage,* 611 F.2d at 279 (that "[t]he district court was familiar with the case and transfer may have led to delay" justified refusal to transfer). "[O]nly in rare instances have appellate courts overridden a trial court's decision not to transfer." *Id.* This is not an appropriate instance. We decline to instruct the district court to grant Allen's motion to change venue.

**CONCLUSION**

We reverse the district court's grant of summary judgment, affirm the denial of Allen's venue motion, and remand for further proceedings consistent with this opinion.

It may be that, as the proceedings unfold after remand, particular defendants will prove entitled to a directed verdict or equivalent relief. We believe, however, that on the present record, "[t]he parties are entitled to have the trier of fact, acting in that capacity, pass judgment on the sufficiency of the evidence." *Scharf,* 597 F.2d at 1243.

The resolution of this case will depend to a great extent on the credibility of witnesses with conflicting statements, the motives that can be inferred from the parties' actions, and the relative cumulative weight of the parties' evidence. As the Supreme Court has recently reiterated: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 106 S.Ct. at 2513. We therefore believe this case cannot be properly decided by summary judgment.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

NOONAN, Circuit Judge, dissenting:

A party moving for summary judgment has the burden of " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party does not—as some courts of appeals have misread *Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)—have the burden of *proving* the absence of evidence to establish all the essential elements of the non-movant's case. *Celotex,* 106 S.Ct. at 2554. If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial," no genuine issue as to any material fact remains and the moving party is entitled to summary judgment. *Id.* at 2553. In this case, Allen, the nonmovant, has failed to show such essential elements of his case as causation and damage. Each of the defendants is entitled to judgment as a matter of law.

A tort is not committed unless D does something injurious to P which causes P damage. To state a cause of action in tort, we must know who D is and what D did and what damage D caused. Constitutional torts are not exempted from these elementary requirements. The opinion of the court fails to tell us who D is, what D did, and what damage D caused.

The gravamen of Allen's complaint is that he was demoted and harassed in retaliation for, and in anticipation of, remarks he made to the press. The claim that he was demoted because of speaking to the press states a cause of action. Allen, however, has offered no evidence that any defendant did demote him because he spoke to the press.

Allen's other claim, that he was harassed, does not necessarily state a cause of action under the First Amendment or under 42 U.S.C. 1983. The ambiguity inherent in the claim of harassment must, upon inspection of Allen's affidavit, be resolved against him: his complaint, as fleshed out by the affidavit, does not state a cause of action as to harassment.

As neither prong of his complaint holds up, summary judgment for the defendants should be affirmed.

*Allen's Demotion*

Allen's Third Amended Complaint alleges that his demotion was caused by Richard

Rominger, director of the California Department of Food and Agriculture; Jerry Scribner and Hans Van Nes, deputy directors; and by Robert V. Dowell, Lyndon Hawkins, Robert F. Hobza, Charles D. Hunter, and Olaf S. Leifson, employees of the department. Allen's allegation is that these defendants "conspired to retaliate against him" and did retaliate "by demoting and reassigning him from the medfly project to a position within the Department in Sacramento...." The allegation states a claim cognizable under 42 U.S.C. 1983. Insufficient evidence supports it. The opinion of the court does not distinguish between the eight state defendants. A review of Allen's complaint and evidence shows that they are alleged to have acted in different ways. None of these ways turn out to involve Allen's demotion or to be actionable.

Allen's affidavit states: "Scribner removed me from the Medfly Project completely, and reassigned me to Sacramento, where I was assigned to trivial, clerical tasks...." Allen does not claim and his evidence does not show that Scribner was responsible for anything more than the transfer back to Sacramento. Nothing he has offered goes to show Scribner was responsible for assigning him the work he was given. The question, then, is whether the transfer, in and of itself, amounted to a constitutional tort. The court in n. 16 takes the position that even if the tasks Allen was made to perform "were commensurate with his training and experience" they were significantly different from the field work he had been performing and if Allen "reasonably felt the office work was less desirable," the transfer would have been tortious.

The court goes beyond the cases it cites in support of this position. In *McGill v. Board of Education*, 602 F.2d 774 (7th Cir.1979), the court expressly qualified its statement on transfers by specifying that tortious transfers were "to a school with a less desirable reputation or one perceived as dangerous or one that is difficult to get to." *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir.1983) cites the language of *McGill* but actually approves a transfer "at least

indirectly traceable to *Hughes'* various speech-related accusations and investigations." *Id.* at 1421. *Simpson v. Weeks*, 570 F.2d 240 (8th Cir.1978) involved a negative evaluation in retaliation for speech. No case before now appears to have held that a transfer to a position commensurate with an employee's training and experience was tortious unless there was something about the new job site that made performance of work there significantly less attractive. Nothing in Allen's complaint or affidavit alleges or shows that Scribner knew he was transferring Allen to a significantly less attractive place to work. Obviously, transfers can be a weapon of bureaucratic reprisal. Just as obviously, transfers can be for the efficiency of the service. Unless a plaintiff can show that there was something about the transfer, beyond the transfer itself, by which he was injured, he has not stated a case.

As to the other defendants, no evidence at all has been offered against Rominger, the department's head. The court relies on a single affidavit executed by one Cynthia Watts. This affidavit relates hearsay that she had been told that Tween had been told by "several state and/or federal officials" to remove Allen. This hearsay, if objected to would not have been admissible. Fed.R. Civ.P. 56(e). If Cynthia Watts testifies at the trial, this evidence will not be admissible if objected to. Since it was not objected to here, it may be considered. *Bieghler v. Kleppe*, 633 F.2d 531, 534 (9th Cir.1980). What does the Watts hearsay prove? Indulging the plaintiff in drawing the most favorable inferences to him, it can be inferred that there were state officials who wanted Allen removed. It is not an inference, but a blind guess that Rominger was one of those officials. There is a difference between inferring and guessing. We have no business engaging in guessing.

The parties are entitled to have the determination of their rights rest on more than speculation and guesswork. *Neely v. St. Paul Fire and Marine Insurance Co.*, 584 F.2d 341, 346 (9th Cir.1978) (summary judgment against plaintiff affirmed where jury would have to rely "upon surmise and spec-

ulation."). Fed.R.Civ.P. 56(e) requires the party opposing summary judgment "to set forth specific facts" if he is to defeat the motion. It is not enough to come up with the "supposition, speculation, and conclusory argument of counsel." *British Airways v. Boeing Co.*, 585 F.2d 946, 954 (9th Cir. 1978). On a motion for summary judgment, "the trier of fact is not permitted to resort to speculation and surmise." *National Industries, Inc. v. Republic National Life Insurance Co.*, 677 F.2d 1258, 1267 (9th Cir.1982).

Not only does the Watts hearsay fail to tell us anything at all about Rominger, it tells us nothing about the motivation of those who wanted to remove Allen. As far as appears from the Watts hearsay, the reason the anonymous officials wanted Rominger out was because he was an insubordinate employee. Again, the court does not draw an inference, but makes a guess when it supposes that the Watts affidavit supports Allen's claim that he was transferred because of his exercise of speech. The affidavit is not evidence against him at all. Nor can Rominger be made to answer a Section 1983 suit on the ground of *respondeat superior. Johnson v. Glick*, 481 F.2d 1028, 1034 (2nd Cir.1973) (per Friendly, J.).

Van Nes is shown, by the plaintiff's evidence, to have warned him not to speak to the press, and Leifson to have threatened him with reprisal if he did so. No evidence connects Van Nes' warning or Leifson's threat to what actually happened, viz. his assignment to work Allen describes as trivial. Leifson's alleged threat *followed* his alleged demotion by six months. As to Dowell, Hawkins, Hobza and Hunter, what the plaintiff swears they did was to harass and humiliate him in his new job. By no stretch of the imagination does this testimony show that they conspired to put Allen in his new position.

In no way does the court specify how these subordinate employees in the Department could have demoted Allen. Hans Van Nes, Robert V. Dowell, Lyndon Hawkins, Robert F. Hobza, Charles D. Hunter, and Olaf S. Leifson are compelled by this court to answer a complaint for which the plaintiff provides no evidence whatsoever.

Justice is owed to individuals. It is not enough for a plaintiff to have the vague idea that something is amiss and then hold responsible everyone who comes to mind. At a minimum the aggrieved party must be able to show that the individuals he is suing had some connection with the alleged wrong. This Allen has spectacularly failed to do as far as Van Nes, Dowell, Hawkins, Hobza, Hunter, and Leifson are charged by him with transferring and demoting him. With no evidence at all he has slandered these men and subjected them to the trials and hazards of litigation. It makes matters worse for this court to put an apparent seal of approbation on such malicious pleading and such unfair lawyering.

### Allen's Harassment

"Harassment" is a term which embraces both physical and verbal conduct. Physical action by government officials to prevent free speech is a constitutional tort. Verbal action is another story, not least because verbal action presumptively itself enjoys the protection of the Constitution. The conduct of each defendant needs to be inspected to determine whether any of them in any unconstitutional way harassed Allen.[1]

---

1. The opinion of the court at footnote 17 relies on *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982) for the proposition that Allen has a claim for "the alleged harassment." The footnote suffers from not analyzing what the alleged harassment in *Bart* consisted in. In *Bart* the harassment consisted in the "selective enforcement of work rules" and in reprimands by the plaintiff's boss, the mayor of the city. *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Judge Posner went on to say

Yet even in the field of constitutional torts *de minimis non curat lex.* Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise—that if the Mayor of Springfield had frowned at Miss Bart for running for public office he would be liable for damages (unprovable, of course) under section 1983.

1. *Gordon Tween.* On August 5, 1980, Tween issued a memorandum reading as follows:

"To promote continuity in information dissemination to the news media the following procedures will be followed:

"Please refer all news media inquiries to Don Henry/Gordon Tween or their assigned representatives. Should the responsible person be unavailable, take a message. Do not attempt to supply information unless you have been directed to do so." CR 176:32–41, 72–78, Exhibits A and G.

Authorship of that memorandum is the only specific action of Tween that Allen has alleged and offered proof of having happened.

The memorandum was as blameless as any office manual on policy and procedures. Every level of government, including the courts, has authorized spokespersons. Approved channels for conveying information to the press are standard in government or business. To ask Tween to answer in damages for such a normal and necessary directive is to make routine procedure a violation of the Constitution.

2. *Robert Milam.* Allen's affidavit declares: "Milam stated that he would personally spray me with pesticide, from an airplane, if I spoke to the media. I felt physically threatened and therefore avoided talking to the press." Allen's Complaint is here more detailed than his affidavit. The Complaint says that this threat was made by Milam in Allen's office, and that Milam also said, "I will have your head." The threat, the Complaint says, "did in fact have a chilling effect on Plaintiff's exercise of his rights of free speech."

It is of course doubtful that, if Milam actually uttered the words complained of, he uttered them in a literal sense. We can rule as a matter of law that he did not intend to treat Allen as Herod treated John the Baptist. We could with almost equal confidence rule that he did not mean to

suggest that he would get in a plane and fire away at Allen.

Even taking his words with an almost obtuse literal mindedness, they did not amount to an assault at common law. For that, there has to be "a threat of violence exhibiting an intention to assault, and a present ability to carry the threat into execution." *Read v. Coker,* 73 C.B. 850, 138 Eng.Rep. 1437 (Common Pleas 1853); *Tuberville v. Savage,* 1 Mod. 3, 86 Eng.Rep. 684 (King's Bench 1669). If Milam had been in the plane with his hand on the spray gun and Allen had been in his sights on the ground, Milam's words would have been a tort. Uttered in Allen's office, they were, if said, bluster and bullying, nothing more.

Constitutional tort law has been molded by the courts with attention to state tort law. In general, it is crystal clear that verbal intimidation is not a constitutional tort. *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979). The furthest this circuit has gone in recognizing verbal intimidation as tortious is to hold that in the special context of a prison a constitutional tort is committed by prison officials threatening a prisoner with bodily harm if he sought legal redress for beatings. *Gaut v. Sunn,* 792 F.2d 874 (9th Cir.1986); *cf. Hudspeth v. Figgins,* 584 F.2d 1345 (4th Cir.1978), *cert. denied* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979). The rationale is that, given the nature of prison and prison guards, such threats are likely to be successful in cutting off access to the courts. *Gaut* at 875.

Milam was not a prison guard and Allen was not a prisoner. The most that is alleged here is that Allen's First Amendment rights were "chilled." The evidence shows that the allegation is far from true. Allen continued to speak boldly to the press. The threats were not successful. Access was not cut off. No constitutional tort was constituted by the words.

3. *Olaf S. Leifson.* According to Allen's affidavit, in June 1981 Leifson yelled

*Id.* at 625. In our case, the most Allen has shown are frowns and barks, not discipline imposed by his supervisor.

at him, "If you talk to the press, I'll have your ass." Allen declares, "As a result, I felt physically threatened and in great emotional distress, and feared for my life. I fled Sacramento for two weeks and went to Santa Maria for safety.... Since June 1981 I have felt continually physically threatened by Leifson and have experienced great stress when running into him in the Department hallways and elevators."

The expression, "I'll have your ass" is no more literal than "I'll have your head." As a matter of law we could rule that it conveyed no physical threat. Allen, it appears from his affidavit, has difficulty with some standard American colloquialisms—for example when Van Nes told him that the Department could not speak with "a forked tongue," Allen understood him to say that the Department could not speak "with fork and tongue."

Even if Leifson's supposed language was understood in the most literal sense, no evidence has been offered that it amounted to an assault, let alone a constitutional tort. The frisson experienced by Allen is not actionable. His ardor to speak to the press was not chilled. Whatever emotions attended his encounters in elevators with Leifson, he spoke again to the public and the press in the fall of 1981 after his abrasive meeting with Leifson. The threat, if there was one, was ineffective.

4. *Hans Van Nes and Lyndon Hawkins.* Allen's affidavit tells how they called him at home and told him not to attend a hearing before a state senate committee. When he ignored the request and went to the hearing, "they accosted me and again demanded that I not enter the hearing room." This action did not deter Allen. But the chairman of the committee quashed his subpoena to testify and for that reason he apparently did not testify. Allen suggests that Van Nes "convinced" the chairman to quash the subpoena. Allen does not indicate how Allen formed this belief or what would be illegal in so convincing the chairman. Again we are confronted with guesswork and speculation which cannot defeat a motion for summary judgment. *National Industries, Inc. v.*

*Republic National Life Insurance Co.,* 677 F.2d 1258, 1267 (9th Cir.1982). Nor does he indicate any tort in the telephone call and repeated requests directed to him by Van Nes and Hawkins.

5. *Robert V. Dowell, Robert F. Hobza and Charles D. Hunter.* Dowell, Hobza, and Hunter, plus Hawkins and Leifson, are said in Allen's affidavit to have subjected him to "abuse, harassment, and stress at work." What this general allegation means is apparently spelled out by what follows in more specific allegations. Hobza allegedly ordered Allen not to talk to the press. Hunter and Hawkins are said to have destroyed phone messages from the press which had been put on the board at work. Dowell, Hawkins, Hobza and Hunter are all alleged by Allen to have put him "under surveillance" and "monitored and watched" him to keep him from speaking to the press. In her affidavit Doris Jennings supports Allen's belief about the phone messages and uses identical language with that of the plaintiff in swearing that the defendants "constantly watched and surveilled him." None of these allegations state a constitutional tort. Hobza's verbal order was no tort. The alleged destruction of the messages on a public board is difficult to classify as a deprivation of a constitutional right; neither life nor liberty nor property was taken. To be watched or monitored is no tort. Confinement or imprisonment was not attempted or contemplated.

### Allen's Damages

Allen's Complaint alleges that as a result of the wrongful conduct of each of the defendants he was "injured in his health, strength, and activity, sustaining injury to his nervous system and person" and that he believes such injuries "will result in some permanent disability and impaired earning capacity." Allen's affidavit asserts, "As a direct result of the stress and harassment perpetrated on me by defendants at work, I have developed psychiatric and physical disorders and have been in psychotherapy."

Allen's evidence of damages does not support the claim of the Complaint against Tween, Milam, Scribner, or Rominger. None of these men are said by Allen to have "perpetrated" stress on him "at work." These defendants cannot be held liable for harm they did not cause. There can be no tort without injury.

As to the six state employees alleged to have caused stress, stress caused by "monitoring" and "watching" as well as stress caused by sharing an elevator and by harsh vernacular language is not the kind of harm cognizable in an action for the vindication of one's civil rights.

### The General Conspiracy Claim

Allen's complaint does not charge the defendants Gordon Tween and Robert Milam, employees of the United States Department of Agriculture, with his demotion. Nor is any evidence offered to show that they demoted him. It is difficult to imagine how they could have demoted him. Demotion, if it occurred, was done by officials in the state department. It was beyond the power of any federal official. The federal officials are, however, charged with conspiracy to remove Allen.

The opinion of the court at n. 18 observes, "Tween was mentioned by name in the Watts affidavit." But the opinion fails to observe that the Watts hearsay is simply reporting a conversation with Tween. At no point does Watts say that she had any information that Tween acted on the requests made to him. Again, we are confronted not with an inference but a guess—a guess that because Tween said he had been told to do something, he did it and that he had the power to do it. Once more the court engages in what a strong line of precedents tells us is impermissible—defeating summary judgment by a surmise. *National Industries, Inc. v. Republic National Life Insurance Co.*, 677 F.2d 1258, 1267 (9th Cir.1982).

The court at n. 18 also puts an emphasis on Scribner's declaration "that he arbitrated several disputes between Tween and Allen and that Tween informed him he could no longer work with Allen." The court says that, "Construing the evidence in the light most favorable to Allen, we cannot ... conclude that Rominger and Tween were not partly responsible for Allen's transfer." But absolutely nothing in what the court relies on suggests that Tween's dissatisfaction arose from Allen's statements to the press. In no way does Scribner's declaration provide evidence that Tween was responsible for demoting Allen because of Allen's exercise of his right to free speech. To the contrary, Scribner's declaration states that the most serious dispute between Allen and Tween concerned "Mr. Allen's refusal to develop and implement a system to ensure quadrants were being surveyed for larvae." Scribner goes on to state that Allen "was asked to concentrate on fruit collection, but he refused to do this job unless he could do the larvae information also. At this point Gordon Tween informed me he could no longer work with Mr. Allen." It is extraordinarily difficult to understand how the court can quote selectively from the Scribner declaration to find that it gives any support to Allen's case.

In addition to the slightly more specific claim that Tween, Rominger and Scribner conspired to remove him and that they plus Hawkins, Hobza, Hunter and Van Nes conspired to demote him, Allen alleges in his Complaint that all the defendants deprived him "of his freedom of speech and deprived him of his liberty and property without due process of law." This broad claim is completely conclusory. It was unsupported in the Complaint except as it referred back to the earlier allegations. No evidence was offered by Allen to prove its truth. It adds nothing to the claims already dealt with.

### The First Amendment Rights of Hawkins, Hobza, Leifson, Milam, Van Nes and Tween

Six of the defendants have got into legal trouble by their words—words in five instances allegedly addressed to Allen and in Tween's case addressed to workers on the Medfly Project. For these words they have had to busy themselves with lawyers and have their depositions taken and be

prepared to pay large damages. Indeed Allen's complaint asks from each of them the damages he can prove plus $1 million in punitive damages plus attorney's fees. In Allen's pendent state claims—now dismissed—he sought additional punitive damages from each defendants totaling $4,100,-000. If any one has been harassed for speaking, it is the defendants who have been harassed by Allen.

To say that the threat of such damages and the actuality of having to answer in a lawsuit do not have a chilling effect on free speech would be to suppose a government of heroes. The effect of the court's opinion will chill to near the freezing point. Any official who knows of this case will watch his tongue when he speaks to a potentially disgruntled employee.

The language used by Tween, Hawkins, Hobza, and Van Nes was admittedly inoffensive. At least Allen has found nothing to complain of in its style. His opening brief characterizes Tween's memo as setting "the official unconstitutional media policy of the project." If Tween's policy was unconstitutional, most departments of the government operate unconstitutionally. Van Nes, according to Allen, did what any citizen has a right to do—exercise his First Amendment right of speech to persuade a legislator not to call a witness. The language allegedly used by Leifson and Milam was rough. Rough or smooth, inoffensive or unkind, the speech was entitled to the protection of the First Amendment unless it was criminal or tortious. It was concededly not criminal. The court's opinion makes it constitutionally tortious. Expansion of Allen's free speech rights curtails the free speech of those who represent the government.

### The Federalist Issue

To use the federal tort law to discipline state officials is to assert the paramount position of the Constitution. Salutary in itself, the practice injures the right relationship of the states to the federal government when a tenuous tort is teased out of the ordinary conduct of state business. Cf. *Kannisto v. City and County of San Francisco,* 541 F.2d 841, 845 (9th Cir.1976) (Sneed, J., concurring). Respect for the federal system as much as respect for the great guarantee of free speech requires a federal court not to let a federal case be fashioned out of innocent orders, misunderstood language, unsubstantiated claims of conspiracy and exaggerated emotional reactions.

I would Affirm.