21 F.3d 1112
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Frank DONAHUE; Jackson Killough, aka Chris Killough, an
individual, Plaintiffs-Appellees,
v.
William CASEY, an individual, Defendant,
and
Greg Winters, an individual, Defendant-Appellant.
 No. 92-16861.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 10, 1994.*
Decided April 25, 1994.
 
 1
 Before: ALARCON and FERNANDEZ, Circuit Judges, and HILL, District Judge**.
 
 
 2
 MEMORANDUM***
 
 
 3
 Gregory Winters, the captain of the San Francisco police department's Richmond Station, appeals the district court's denial of his motion for summary judgment based upon qualified immunity from suit. We affirm.
 
 BACKGROUND
 
 4
 Frank Donahue was a San Francisco police officer assigned to Winters' station. In May of 1989 Donahue observed an incident that formed the basis of a citizen complaint against a fellow officer. Donahue subsequently testified about the incident at a police department Office of Citizen Complaints ("OCC") hearing. The complaint was sustained and the other officer was officially reprimanded by the chief of police.
 
 
 5
 The reprimanded officer and his partner believed that Donahue lied in his OCC statement. They expressed their opinions to Winters, who was apparently persuaded by them. In February of 1991 Winters sent a memorandum to the chief of police recommending that Donahue be transferred to another station. In the memorandum, Winters explained that the transfer was necessary because Donahue had a "serious credibility problem after instigating complaint against two fellow officers, self-aggrandizing at cost of station operations." The police chief rejected this explanation and denied the transfer.
 
 
 6
 No evidence suggests that Winters ever seriously investigated the veracity of Donahue's statements to the OCC investigators. The police department's Office of Management Control ("OMC"), which did examine Donahue's statement, concluded that it contained no material misrepresentations of fact.
 
 
 7
 In March, Winters met with deputy chief Murphy to discuss transferring Donahue. After the meeting, Winters prepared a new memorandum, stating that Donahue's deficient report writing skills and low productivity were the reasons for his proposed transfer. When Donahue's attorney observed that the proposed transfer was retaliatory and threatened legal action, the chief of police rescinded it.
 
 
 8
 Winters was upset that the transfer proposal had been rescinded and that he had not been consulted before it was. He expressed his displeasure and his belief that Donahue should have been transferred to at least two of his sergeants. In the next few weeks, Donahue was the victim of selective and inconsistent enforcement of police rules. He was not allowed to continue working with his chosen partner, even though department policy was to effectuate officer pairing requests where possible. He was assigned to the most dangerous area in the precinct without adequate backup. In contravention of department policy, his personnel file was documented, without his knowledge, for deficient report writing. On April 16, 1991, Donahue went on sick leave claiming job related stress.
 
 
 9
 On April 18, 1991, Winters ordered one of his sergeants to document any subsequent rules infraction committed by Donahue at the time it occurred. In May, Donahue's attorney negotiated a back-to-work agreement with the deputy chief of police. The department agreed that Donahue would suffer no further retaliatory measures. Donahue returned to work on May 28, 1991.
 
 
 10
 Upon returning to work, Donahue was told that his medical certificate of fitness to return to work was insufficient. He was assigned to duties inside the station house. Despite contrary department policies and customs, Donahue was not permitted to wear his uniform outside the station house, or to use a department vehicle to get his lunch. He was also required to report to a junior officer. A sergeant wrote a memorandum reprimanding Donahue for poor report writing. The memorandum, which concluded with a recommendation that Donahue be transferred to the police academy for retraining, was initialed by several superior officers, including Winters. Donahue did not return to work after May 28. Instead, this action ensued. Donahue alleged that, given the harassment and retaliation to which he had been subjected, he had not been able to continue working with the department. Winters sought summary judgment on his qualified immunity defense, but the district court denied it. He appealed.
 
 JURISDICTION STANDARD OF REVIEW
 
 11
 The district court had jurisdiction under 28 U.S.C. Secs. 1331 & 1367(a). We have jurisdiction under 28 U.S.C. Sec. 1291. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We review de novo a district court's denial of a motion for summary judgment based upon a defense of qualified immunity from suit. Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993).
 
 LEGAL STANDARDS
 
 12
 The standard for determining whether a law enforcement official is entitled to qualified immunity was established in Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. (citations omitted). In other words, the standard is whether "in light of clearly established law" a reasonable official could have believed that his actions were lawful. Id. at 641, 107 S.Ct. at 3040. As we said in Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993): "This standard requires a two-part analysis: 1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?"
 
 
 13
 A few satellite rules surround this standard and aid in its application. Both parts of this standard are issues of law for the court to decide. Id. at 873. However, if some issues of historical or concrete fact must be decided before the legal questions can be answered, the court should "postpone the qualified immunity determination until the facts have been developed at trial." Id. at 873-74. Finally, "[t]he operation of this standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson, 483 U.S. at 639, 107 S.Ct. at 3038-39. If the clearly established law is determined at too high a level of generality, it will not be an objective standard at all and "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id. at 639, 107 S.Ct. at 3039. On the other hand, it cannot be said "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful...." Id. at 640, 107 S.Ct. at 3039. Still "the unlawfulness must be apparent" and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id.
 
 
 14
 At the most general level, Winters must have understood that he could not violate Donahue's First Amendment rights, but of course that is far too general. It is not difficult to become more specific, for, as the Supreme Court said long ago, public employees do have an undoubted right to comment upon matters of public concern and may even do so if those comments are directed at their superiors. Pickering v. Board of Educ., 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); see also Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 281-85, 97 S.Ct. 568, 573-75, 50 L.Ed.2d 471 (1977); Allen v. Scribner, 812 F.2d 426, 430-36 (9th Cir.1987). Indeed, even an error made in those statements cannot result in retaliation. As the Court concluded in Pickering, "[i]n sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Id., 88 S.Ct. at 1738 (footnote omitted). Because the exception may be of some importance in this case, it should be emphasized that outright lying certainly does not have First Amendment protection. Simply put, "there is no constitutional value in false statements of fact." Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). This is much more specific and much closer to the clear contours of First Amendment rights that Winters can have been expected to have discerned as he approached his handling of Donahue's situation.
 
 
 15
 But it is possible to become more specific yet, and to get closer to home at the same time. In Sanchez v. City of Santa Ana, 936 F.2d 1027 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991), we considered the case of police officers who attempted to create a more favorable environment for Hispanics in the police department. They spoke out about discrimination and chartered a chapter of the Latino Peace Officers Association. Id. at 1031. What ensued was selective enforcement of police department rules, peer ostracism, poor backup during certain police operations, the keeping of secret and illegal files, and poor reviews. Id. at 1031, 1038. All of this was done in retaliation for their exercise of their First Amendment rights, or at least arguably so. Sanchez resigned from the department when he lost his merit pay; he claimed constructive discharge. Id. at 1032. Torres resigned after reprimands for exercising his First Amendment rights; he too claimed constructive discharge. Id. at 1031-32.
 
 
 16
 In our decision we delineated the various elements that an employee must show in order to make out a claim for First Amendment protection--the employee's statement must be one of public concern, the employer must be motivated to engage in adverse conduct because of the statement, and the employee's interest in commenting must outweigh the employer's interest in efficiency. Id. at 1038. The defendants, in effect, conceded that there was First Amendment protection and we held that the plaintiffs were "entitled to a jury determination of whether the first amendment has been violated, and by whom, and what damages, if any, would be required to repair any injuries caused by the alleged retaliation." Id. Surely, Sanchez was sufficiently specific notice to Winters of his obligations to Donahue under the First Amendment.
 
 
 17
 Let us, then, turn to the facts of this case as they now appear. In the first place, absent falsity, there can hardly be any doubt that the statement which Donahue made to OCC was protected First Amendment speech of a public employee. It takes no detailed analysis to show that. It takes no hierophant to discern it. The very purpose of OCC is to investigate citizen complaints about police officer activities and Donahue was required to make a statement to that body.
 
 
 18
 Second, on this record it is not possible to say that Donahue's speech was stripped of protection due to some form of knowing or reckless falsity. In fact, OCC was satisfied of the statement's essential truth, as was OMC.
 
 
 19
 Third, the evidence leads almost inexorably to the conclusion that Donahue was retaliated against for making that very statement.
 
 
 20
 Fourth, the form of retaliation used or directed by Winters bears an uncanny resemblance to the retaliation we commented upon in Sanchez. Perhaps Winters' forms of retaliation went even further in some respects.
 
 
 21
 Donahue was ostracized. Donahue was a victim of selective enforcement of the rules, and--after years of good reviews--was suddenly subjected to numerous reports of unsatisfactory performance of his duties. He was deprived of common amenities, such as patrol with a partner of his choice. He was placed in a patrol situation which was more dangerous than others, and in one where backup became problematic. His personnel file was documented illegally--that is, without his knowledge, which is in violation of departmental policy. After he went on sick leave, he returned for just one day and in that brief period he was prevented from wearing his uniform outside of the station, was not allowed to take a police car to lunch, was forced to report to a junior officer, and was written up and reprimanded for poor report writing. This latter writeup was used by Winters in still another attempt to get Donahue transferred out of the station. Winters had tried that twice before without the desired result. All of this, it must be said, took place within a period of a few months, and all of it followed Donahue's making of his statement to OCC. Under that pressure, Donahue left.
 
 
 22
 Given all of this and given the established jurisprudence of the Supreme Court and this circuit, we cannot see how Winters can hope to claim that he reasonably believed that his conduct was lawful, unless he somehow reasonably believed that Donahue's statement to the OCC was false--so false that it fell outside of the protective mantle of the First Amendment. On this record, we do not see how Winters could possibly have entertained that belief, though perhaps a more complete development of the facts will someday show that he could have. At any rate, he certainly was not entitled to summary judgment on his qualified immunity claim. See Allen, 812 F.2d at 436.
 
 CONCLUSION
 
 23
 Because Donahue gave his statement to OCC, Winters became distressed at and dissatisfied with him. Winters decided to retaliate. His first attempt came to naught. So did his second. Winters was not amused. His reaction reminds us of Henry II's reaction to Thomas Becket's various positions about the power of the Church: In speaking of his own minions, Henry lamented: "Not one of them will avenge me of this turbulent priest!" 1 Winston S. Churchill, A History of the English Speaking Peoples 155 (Bantam Books ed. 1963). Vengeance soon followed. Besides Winters' own direct actions, those under him did set out to avenge Winters, and perhaps themselves, upon Donahue. They and Winters succeeded. Donahue was driven from active membership in the police force. We are unable to say that Winters is entitled to immunity for his part in this unfortunate episode.[1]
 
 
 24
 AFFIRMED.
 
 ALARCON, Circuit Judge, dissenting:
 
 25
 I respectfully dissent. I cannot join my colleagues because the facts, when reviewed in the light most favorable to Officer Donahue, fail to demonstrate that he has standing to maintain a civil rights action against Captain Winters. Officer Donahue's evidence presented in opposition to the motion for a summary judgment does not show that Captain Winters' conduct caused constitutional injury. The majority has concluded that Captain Winters' failed attempt to transfer Officer Donahue demonstrates retaliation for protected speech. It is not clearly established law that an attempt to retaliate against a person for the exercise of First Amendment rights is actionable under section 1983. In fact, under the law of this circuit, a failed attempt to retaliate is not a constitutional injury. Dooley v. Reiss, 736 F.2d 1392, 1394-95 (9th Cir.), cert. denied, 469 U.S. 1038 (1984).
 
 
 26
 The majority has also concluded that Captain Winters must stand trial for the acts of those under him who "set out to avenge Winters, and perhaps themselves, upon Donahue." Majority opinion at 11. No authority is cited for the proposition that Captain Winters can be held liable for the conduct of each of the officers in his command who, without his knowledge or direction, arguably deprived Officer Donahue of a constitutionally protected right. This is understandable because the law is to the contrary. See Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) (Congress did not intend to impose section 1983 liability on a person who did not cause the deprivation of a federal constitutional right); see also Palmer v. Sanderson, 9 F.3d 1433, 1437 (9th Cir.1993) (the doctrine of respondeat superior is not applicable in a section 1983 action). Before discussing the controlling law further, I shall set forth a detailed recitation of the facts presented by the parties in the summary judgment proceedings. The undisputed facts demonstrate that Officer Donahue did not suffer a constitutional injury as a result of Captain Winters' conduct.
 
 I.
 Pertinent Facts
 
 27
 Officer Donahue alleged in his complaint that Captain Winters retaliated against him after he provided a statement concerning a fellow officer's misconduct, thereby depriving him of rights protected by the First Amendment. Captain Winters filed a motion for a summary judgment based on the defense of qualified immunity. In support of his motion, Captain Winters submitted a declaration and portions of his deposition.
 
 
 28
 In his declaration, Captain Winters alleged that in January of 1991, the San Francisco Chief of Police directed him to select police officers and sergeants to be transferred to another precinct. On January 29, 1991, Captain Winters asked the lieutenants and sergeants under his command to suggest the names of the persons that should be transferred. On the same date, Captain Winters was presented with a list which included Officer Donahue's name.
 
 
 29
 Sometime after January 29, 1991, Officer Jill Connolly and her union representative, Officer Michael Murphy, discussed with Captain Winters an upcoming disciplinary hearing scheduled against Officer Robert Ramos and Officer Connolly.
 
 
 30
 It is undisputed that on May 12, 1989, Officer Donahue observed San Francisco Police Department Officer Ramos and Officer Connolly detain a high school female. On May 22, 1989, the young woman filed a complaint against Officer Ramos and Officer Connolly with the Office of Citizen Complaints (OCC). An investigator from the OCC interviewed Officer Donahue concerning this incident, at which time Officer Donahue stated that Officer Ramos used profanity in his conversation with the student. This interview was recorded.
 
 
 31
 Officer Connolly and Officer Murphy told Captain Winters that Officer Donahue lied in his statement to the OCC about the May 12, 1989, incident. Officer Connolly had been furnished a copy of Officer Donahue's taped statement. Captain Winters listened to the tape. He also reviewed the record of the disciplinary proceedings.
 
 
 32
 On February 7, 1991, Captain Winters attended that disciplinary proceeding. By the conclusion of the hearing, Captain Winters "held the firm belief that Officer Donahue had lied in his statement out of personal animosity toward Officer Ramos." He "left the Chief's hearing with the understanding that the Department would investigate Officer Donahue's misconduct."
 
 
 33
 Upon Captain Winters return to his office on February 7, 1991, he was informed that he should provide reasons for the transfer of the police officers and sergeants on the list prepared by his lieutenants and sergeants. Without consulting his staff for the specific reasons that motivated their recommendation that Officer Donahue be transferred, Captain Winters reported that his recommendation was based on his belief that Officer Donahue had lied to the OCC.
 
 
 34
 On March 27, 1991, Officer Donahue's attorney sent a letter to Police Chief Willis Casey. Officer Donahue's attorney stated that Captain Winters told Donahue that he was being transferred from the Richmond Precinct because of his cooperation with the OCC. The attorney also indicated that he had been retained to represent Officer Donahue's interests concerning the Police Department's proposal to transfer him from the Richmond Precinct.
 
 
 35
 On March 28, 1991, Deputy Chief Thomas Murphy rejected the transfer request. Captain Winters asked his staff to explain why they believed Officer Donahue should be transferred. The staff cited Officer Donahue's "low productivity and similar work performance issues."
 
 
 36
 Before taking any further action, Captain Winters reviewed Officer Donahue's file. It contained a written report indicating that on March 14, 1991, Officer Donahue had allowed two prisoners to escape because he failed to follow routine procedures for transporting and handcuffing prisoners. The officer who compiled the report recommended that disciplinary action be taken against Officer Donahue. Officer Donahue's file also contained a report indicating that in February, 1991, Officer Donahue had fabricated a false social security number in a police report to cover up his failure to follow proper citation release procedures.
 
 
 37
 On March 28, 1991, Officer Donahue received a notice from Captain Winters informing him that he was being transferred. The notice stated:
 
 
 38
 [T]he primary basis of my recommendation that you be transferred is that your level of productivity is low, your report writing is deficient, your knowledge of and application of policies and procedures is sub par, your relationships with your fellow officers are negative and adversely affect watch morale. Secondarily, I hold reservations as to your credibility as a witness based upon clear misstatements of fact made by you in the course of an OCC investigation.
 
 
 39
 The proposed transfer was rejected by Captain Winters' supervisors on March 29, 1991.
 
 
 40
 On April 15, 1991, Captain Winters called a meeting of all officers at the Richmond Station to discuss a dispute concerning the supervisory techniques of Sergeant Hom and Sergeant Meixner. Some of the police officers had been keeping a log of the sergeants' conduct and had tape recorded conversations with them. In addition, the sergeants' lockers had been glued shut in retaliation for their work requirements.
 
 
 41
 Captain Winters told all the police officers including Officer Donahue that he would not tolerate this retaliatory conduct against Sergeant Horn and Sergeant Meixner. Captain Winters told the officers to concentrate on doing their jobs.
 
 
 42
 After the April 15, 1991 meeting, Officer Donahue left work claiming that he was suffering from stress. He did not report for duty on April 16, 1991. Captain Winters was aware that Officer Donahue had retained counsel and believed that "we were being set up for a law suit." Captain Winters asked Lieutenant DeFilippo to record, as soon as it occurred, any of Officer Donahue's conduct that was not in conformance with departmental rules.
 
 
 43
 Officer Donahue returned to work on May 28, 1991, after his attorney had negotiated an agreement with the San Francisco Police Department.[1] The entire memorandum reads as follows:
 
 
 44
 Pursuant to our discussions regarding your assignment in the Police Department, I can inform you that both of you will be assigned to the swing watch at Richmond Police Station. To the extent consistent with district patrol deployment, you will be paired as partners, whenever possible.
 
 
 45
 Upon proper application, the department will not oppose the conversion of sick leave taken by you to disability leave.
 
 
 46
 There will be no retaliation against you resulting from your statement to the Office of Citizens' Complaints, nor the contacts with the City's Whistleblower Section. Your performance will be monitored by your supervisors and you will be held to the same performance standard as other officers in the station.
 
 
 47
 A review of your P.I.P. binder will be conducted to identify any entries thought by you to be inaccurate and to allow for your comments within department policy.
 
 
 48
 Captain Winters alleged that he had reviewed the pleadings in this matter regarding the alleged acts of harassment and retaliation claimed by Officer Donahue. He stated that he has no knowledge of any acts of harassment "occurring at any time." Officer Donahue never complained to Captain Winters about "any harassment or retaliation of any kind."
 
 
 49
 Officer Donahue filed a declaration in support of his opposition to Captain Winters' motion for a summary judgment. None of the facts set forth in Captain Winters' declaration are disputed. Instead, Officer Donahue sets forth a list of incidents that occurred after he began to work the swing shift at the Richmond Station in February of 1991. For example, in paragraph 8 he makes the following allegation:
 
 
 50
 In or about February of 1991 I began to notice that [a] large number of officers assigned to the Richmond station were beginning to treat me differently. I began to hear rumors from members of officers that I had lied to the Office of Citizen Complaints, that I was not trustworthy and that I was not someone they might want to partner with. Furthermore, they began to withdraw their friendship and otherwise "shun" me.
 
 In paragraph 10, Donahue alleges:
 
 51
 Subsequent to the recision of the transfer, I was denied the ability to partner with Officer Killough. When I was assigned to a solo car, I was placed in the ocean area of the Richmond precinct. That is the most dangerous area of the precinct at the time of my assignment. At the time that I was assigned to the ocean division, no cars were assigned to the divisions near me. This deployment is highly unusual and is contrary to the experiences I have had in my eleven years with the Department. Based on this deployment if I required immediate backup or assistance, it would have been impossible for another car to have responded quickly.
 
 Paragraphs 13 and 14 read as follows:
 
 52
 13. Upon returning to work, on May 28, 1991 I submitted a release from the LCSW which treated me. This was the same person who signed the release when I went out on my sick leave. I was initially assigned to a patrol vehicle and after I was out for several hours, I was informed that I should return to the station to talk to Defendant Winters. It was at that time I was informed that I would not be allowed to go back out on patrol.
 
 
 53
 14. While at the station on May 28, 1991 I was subjected to numerous forms of harassment. After I was assigned to counter duty, I was forced to take orders from a person with considerably less seniority than I had. While the sergeants were away, the person with less seniority acted as station keeper. As senior officer that should have been my assignment. When I requested to use a station vehicle to obtain lunch, a practice that all officers had utilized in the eleven years that I was with the force, I was not only denied that right but was also informed that if I went out of the station that I could not wear my uniform. Additionally, I was reprimanded for a report that I took from an individual who reported a hit and run accident. I was reprimanded for writing down inaccuracies in the report; however, since I had no personal knowledge of what occurred, I only wrote down what I had been told by the witness.
 
 
 54
 None of these alleged acts refer to any conduct committed or ordered by Captain Winters. In fact, in paragraph 15, Officer Donahue concedes that others were responsible for the conduct set forth in his declaration.
 
 
 55
 15. The improper reprimands for report writing and the improper assignments, were not perpetrated by any single individual. Most, if not all of the Sergeants assigned to the swing shift, as well as Defendant DeFilippo, who was in charge of the ship participated in the harassment.
 
 
 56
 (emphasis added).
 
 II.
 Discussion
 
 57
 The majority lists the following two acts as evidence that Captain Winters retaliated against Officer Donahue for exercising his First Amendment rights: (1) Captain Winters attempted to transfer Officer Donahue; and (2) on April 18, 1989, Captain Winters "ordered one of his sergeants to document any subsequent rules infractions committed by Donahue at the time it occurred." Majority opinion at 4.
 
 
 58
 In his declaration in support of his motion for a summary judgment, Captain Winters explained these actions. Captain Winters alleged that he attempted to transfer Officer Donahue because he believed Officer Donahue had lied in his statement to the OCC.[2]
 
 
 59
 Captain Winters further alleged that he ordered Lieutenant DeFilippo to make a record of any conduct that violated departmental rules because he believed that the San Francisco Police Department was "being set up for a law suit." These explanations were not contradicted in Officer Donahue's declaration. In support of its conclusion that Captain Winters' motion for summary judgment was properly denied, the majority states that Officer Donahue was retaliated against in that he was: (1) "ostracized"; (2) "suddenly subjected to numerous reports of unsatisfactory performance of his duties"; (3) prohibited from "patrol[ling] with a partner of his choice"; (4) "placed in a patrol situation which was more dangerous than others, and in one where backup became problematic"; (5) subject to illegal documentation of his personnel file--that is, "without his knowledge, which is in violation of departmental policy"; (6) "not allowed to take a police car to lunch"; (7) forced to "report to a junior officer"; and (8) "written up and reprimanded for poor report writing." Majority opinion at 9-10.
 
 
 60
 In his declaration, Captain Winters denied knowledge of any of the acts of harassment recited in the pleadings. Captain Winters also stated that no acts of retaliation were reported to him by Officer Donahue. Moreover, Officer Donahue did not present any evidence that the conduct quoted above in items 1 through 8 was committed, directed, or ordered by Captain Winters. Instead, Officer Donahue attributed these acts to Lieutenant DeFilippo and the sergeants on the swing shift, "not to a single individual."
 
 
 61
 I can find no evidence in the record to support the majority's conclusion that Captain Winters "directed" his subordinates to harass Officer Donahue in any manner. After reviewing Officer Donahue's declaration, a proper sense of fairness in the administration of justice should compel us to hold that there is no evidence in the record that Captain Winters directed any act of retaliation. It is also worthy of note that the district court granted Lieutenant DeFilippo's motion for summary judgment based on qualified immunity, notwithstanding Officer Donahue's sworn statement that Lieutenant DeFilippo, the person in "charge of the ship participated in the harassment."
 
 
 62
 Under clearly established law, Officer Donahue is unable to demonstrate that he suffered a constitutional injury because of retaliatory acts allegedly perpetrated by Captain Winters. Additionally, Captain Winters is not liable for the acts of his subordinates because the doctrine of respondeat superior does not apply in a civil rights action pursuant to section 1983.
 
 
 63
 A. A Failed Attempt to Retaliate Does Not Qualify as a Constitutional Injury.
 
 
 64
 To overcome Captain Winters' defense of qualified immunity, Officer Donahue was required to show that a reasonable police commander would have known that it was clearly established that an attempt to transfer an officer believed to have lied in a police discipline proceeding violated a constitutionally protected right. Officer Donahue and the majority have not cited any authority in support of the proposition that a failed attempt to transfer a police officer, even if in retaliation for the exercise of his First Amendment rights, constitutes a deprivation of a constitutional right. The law of this circuit compels us to hold that such conduct is not actionable under section 1983. In Dooley v. Reiss, 736 F.2d 1392 (9th Cir.), cert. denied, 469 U.S. 1038 (1984), we held that "[t]o state a claim under 42 U.S.C. Sec. 1983, a plaintiff must allege that he was deprived of a federal right by a person acting under color of state law." Id. at 1394 (footnote omitted). We affirmed the dismissal of the section 1983 claims in Dooley because the defendants failed in their attempts to conceal evidence to deprive the plaintiffs of their right to bring a section 1983 action. Id. at 1394-95. We held that the plaintiffs suffered no deprivation of a federal right because the defendants' attempt "ultimately failed" and they were able to proceed with their section 1983 action. Id. at 1394.
 
 
 65
 In this matter, Captain Winters' attempt to transfer Officer Donahue also failed. Accordingly, Officer Donahue suffered no deprivation of a federally protected right.
 
 
 66
 B. Ordering a Subordinate Officer to Document Violations of Departmental Rules Committed by a Fellow Officer Does Not Qualify as a Constitutional Injury.
 
 
 67
 According to the majority, "Winters ordered one of his sergeants to document any subsequent rules infraction committed by Donahue at the time it occurred." Majority opinion at 4. The majority uses this fact to demonstrate that Captain Winters retaliated against Officer Donahue, reasoning that "Donahue was a victim of selective enforcement of the rules, and--after years of good reviews--was suddenly subjected to numerous reports of unsatisfactory performance of his duties.... His personnel file was documented illegally--that is, without his knowledge, which is a violation of departmental policy." Majority opinion at 9.
 
 
 68
 The record indicates that on April 18, 1991, Captain Winters asked Lieutenant DeFilippo to document any of Officer Donahue's conduct which violated departmental rules. The documentation of the personnel files of a police officer is governed both by an agreement between the Police Department and its officers and by the California Government Code. According to the Memorandum of Understanding between the City and County of San Francisco, the Police Commission, the Chief of Police, and the San Francisco Police Officers' Association, "[a]dverse comments may not be placed in the member's master personnel files without the member noting so on the face of the document. Members may cause to be placed in their master personnel file responses to adverse material inserted therein." Section 3305 of the California Government Code prohibits the entry of adverse comments in the personnel file of a public safety officer without allowing the officer to read the entry. Cal.Gov't Code Sec. 3305 (West 1980). Section 3306 grants a public safety officer 30 days in which to file a written response to an adverse entry in a personnel file. Cal.Gov't Code Sec. 3306 (1980).
 
 
 69
 Officer Donahue has failed to produce any evidence to substantiate his claim that Captain Winters violated any policy provisions of the Police Department or sections 3305 and 3306 of the Government Code. Neither department policy nor the Government Code prohibit a commanding officer from requesting that one of his subordinates observe the performance of a fellow officer and document violations of departmental rules. Rather, these provisions merely state that an officer is entitled to review an adverse comment prior to the time at which an entry is made in his personnel file.
 
 
 70
 Officer Donahue has cited only one instance in which a report was made and entered in his personnel file subsequent to the April 18, 1991, directive from Captain Winters to Lieutenant DeFilippo. Officer Donahue alleges in his declaration that when he returned to work on May 28, 1991, "I was reprimanded for a report that I took from an individual who reported a hit and run accident. I was reprimanded for writing down inaccuracies in the report; however, since I had no personal knowledge of what occurred, I only wrote down what I had been told by the witness." Officer Donahue does not allege that the report resulted from Captain Winter's directive to Lieutenant DeFilippo. In fact, the record demonstrates that the report was written by Sergeant William Faust and was approved by Deputy Chief Thomas Murphy. Additionally, Officer Donahue has not demonstrated that Captain Winters failed to provide Officer Donahue with an opportunity to review the report before it was placed in his personnel file.
 
 
 71
 In sum, there is absolutely no evidence in the record demonstrating that Captain Winters violated either departmental policy or the Government Code when he instructed Lieutenant DeFilippo to document violations of departmental rules committed by Officer Donahue. Furthermore, Officer Donahue has failed to present any evidence to demonstrate that Captain Winters was responsible for entries which were made in his personnel file subsequent to April 18, 1991. Therefore, Officer Donahue has failed to establish that he suffered any injury as a result of Captain Winters' directive.
 
 
 72
 C. Liability Under the Doctrine of Respondeat Superior is Not Available in a Section 1983 Action.
 
 
 73
 In order to demonstrate that he suffered a constitutional injury because of retaliatory actions taken by Captain Winters, Officer Donahue must establish that Captain Winters himself committed the acts or directed another officer to commit the acts. Captain Winters cannot be held personally liable in a section 1983 action for the acts of his subordinates because the doctrine of respondeat superior is not available to a plaintiff as a theory of liability in an action brought pursuant to section 1983. Palmer v. Sanderson, 9 F.3d 1433, 1437 (9th Cir.1993).
 
 
 74
 In support of his opposition to the motion for a summary judgment, Officer Donahue alleged in his declaration that he received improper reprimands and assignments from "[m]ost if not all of the sergeants assigned to the swing shift" and Lieutenant DeFilippo. Officer Donahue also complained that the police officers assigned to the Richmond Station treated him differently, and "began to withdraw their friendship and otherwise 'shun' me." Contrary to the majority's conclusion that Captain Winters directed these acts, there is no evidence in the record that Captain Winters ordered the police officers to shun or ostracize Officer Donahue. Although the majority has concluded that Captain Winters "directed" Officer Donahue's improper reprimands, unwelcome assignments, and the deprivation of "common amenities," Officer Donahue attributed this treatment to most of the sergeants at Richmond Station and Lieutenant DeFilippo.
 
 
 75
 Furthermore, the undisputed evidence demonstrates that Captain Winters had no knowledge of "harassment or retaliation of any kind." Because Officer Donahue did not offer any evidence which would raise a genuine issue of material fact as to whether Captain Winters "directed" the allegedly improper treatment and assignments, the majority's factual finding in this regard is unsupported by the record, and cannot properly be used to uphold the denial of summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure.
 
 
 76
 D. The Majority's Reliance on our Decision in Sanchez v. City of Santa Ana is Misplaced.
 
 
 77
 The majority relies heavily upon our decision in Sanchez v. City of Santa Ana, 936 F.2d 1027 (9th Cir.1990), cert. denied, 112 S.Ct. 417 (1991). However, the record in this matter sharply contrasts with the evidence before this court in Sanchez.
 
 
 78
 Jesse Sanchez, Victor Torres, and Robert Caro were former officers of the Santa Ana Police Department who were involved in the formation of a chapter of the Latino Peace Officers Association ("LPOA"). Id. at 1031. The plaintiffs alleged that their First Amendment rights were violated because they were retaliated against by officials of the Santa Ana Police Department primarily as a result of their participation in the LPOA. Id. at 1307-08. The district court entered a directed verdict in favor of the defendants. Id. at 1036. We reversed and held that the plaintiffs were entitled to a jury determination as to whether their First Amendment rights had been violated. Id. at 1038.
 
 
 79
 Sanchez is readily distinguishable from this matter because the evidence in Sanchez clearly showed a deprivation of First Amendment rights. Officer Caro's employment was terminated by a party to the action, the Santa Ana Chief of Police. Thus, unlike the circumstances in the matter sub judice, the evidence showed a successful act of retaliation against Officer Caro. Furthermore, Officers Sanchez and Torres testified that the "above identified defendants" were guilty of "numerous instances that a reasonable jury could have found to be unconstitutional retaliation." Id.
 
 
 80
 By contrast, Officer Donahue has not identified any deprivation of clearly established constitutional rights which were allegedly committed by Captain Winters. Therefore, the majority's reliance on our decision in Sanchez is misplaced.
 
 III.
 Conclusion
 
 81
 Officer Donahue failed to present any evidence in response to the motion for a summary judgment showing that Captain Winters deprived him of a right protected under federal law. Captain Winters' attempt to transfer Officer Donahue failed. Under the law of this circuit, a failed attempt to retaliate against a person for the exercise of a federal right is not actionable under section 1983. Officer Donahue has also failed to demonstrate that Lieutenant DeFilippo made an entry in Officer Donahue's personnel file in violation of departmental policy or California law.
 
 
 82
 Officer Donahue's own evidence established that the alleged acts of harassment visited upon him after his role as an informer had been exposed were not committed nor directed by Captain Winters. Because Officer Donahue failed to demonstrate that Captain Winters deprived him of his clearly established constitutional rights, I would reverse the order denying the motion for a summary judgment based on qualified immunity.
 
 
 
 *
 The panel finds this case appropriate for submission without oral argument pursuant to 9th Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 Honorable Irving Hill, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We hasten to add that none of our statements of fact are meant to preclude the full development of the factual picture in this case. They are only a reflection of what we see in the record before us and should not be taken to establish the law of the case as to any of the facts involved here. That factual development we leave to further proceedings in the district court
 
 
 [1]
 The majority states that "the department agreed that Donahue would suffer no further retaliatory measures." Majority opinion at 4 (emphasis added). The use of the word "further" falsely implies that the San Francisco Police Department admitted that there had been prior retaliation. The written agreement contains no concession of past retaliation
 
 
 [2]
 As noted by the district court in its memorandum decision and order, Officer Donahue's statement to the OCC contained false representations. For example, Donahue stated that he knew that the young woman involved in the May 12 incident had a driver's license; in fact, DMV records show that the young woman did not have a license on the date in question. Donahue also told OCC investigators that the young woman was "an excellent kid," even though the detainee actually had an arrest record and had been ordered to stay away from school property