**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DOUG GREISEN,
*Plaintiff-Appellee*,

v.

JON HANKEN,
*Defendant-Appellant.*

No. 17-35472

D.C. No.
3:14-cv-01399-SI

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted October 11, 2018
Portland, Oregon

Filed May 31, 2019

Before: Raymond C. Fisher, Richard R. Clifton
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Fisher

# SUMMARY[*]

## Civil Rights / Employment Retaliation

The panel affirmed the district court's judgment following a jury verdict in favor of Doug Greisen, a former chief of police for the City of Scappoose, Oregon, in his action brought pursuant to 42 U.S.C. § 1983 alleging that Jon Hanken, the former city manager, violated the First Amendment by subjecting Greisen to adverse employment actions in retaliation for his protected speech.

After Greisen discussed his concerns with city council members and government officials about the city's accounting and budgeting practices under Hanken, Hanken initiated investigations of Greisen, suspended him, placed him on an indefinite leave and prevented him from speaking publicly, even as Hanken was releasing information about the investigations to the media. After a city review committee recommended retraction of Greisen's suspension, Hanken resigned.

The panel held that: (1) Greisen provided sufficient detail about his speech to establish that it substantially involved a matter of public concern; (2) he spoke as a private citizen rather than a public employee; (3) the district court properly concluded that Greisen's retaliation claim could be based in part on Hanken's own speech acts, in the form of defamatory communications to the media; (4) Hanken waived his argument that his actions were supported by an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

adequate justification; and (5) sufficient evidence supported the conclusion that Hanken's retaliatory actions proximately caused Greisen's termination, and any error in instructing the jury on proximate cause was harmless. The panel further held that Hanken was not entitled to qualified immunity.

## COUNSEL

Thomas M. Christ (argued) and Julie A. Smith, Cosgrave Vergeer Kester LLP, Portland, Oregon, for Defendant-Appellant.

William Allen Drew (argued) and John D. Ostrander, Elliott Ostrander & Preston P.C., Portland, Oregon, for Plaintiff-Appellee.

## OPINION

FISHER, Circuit Judge:

Doug Greisen was the chief of police for the City of Scappoose, Oregon. In 2012, after more than 10 years in that position, he became suspicious about the city's accounting and budgeting practices. He worried Jon Hanken, the city manager, was hiding something; he believed Hanken was suspiciously defensive about the budget, improperly delayed paying invoices at the end of the fiscal year and had weakened the city's external auditing process. Greisen discussed his concerns with various city council members and others in city government over the following year. In the summer and fall of 2013, Hanken initiated three investigations of Greisen, suspended him, placed him on an indefinite leave and prevented him from speaking publicly,

even as Hanken was releasing information about the investigations to the media. After a city review committee recommended retraction of Greisen's suspension, Hanken resigned. Hanken's replacement subsequently fired Greisen, who has since been unable to find work.

Greisen sued under 42 U.S.C. § 1983, alleging Hanken violated the First Amendment by subjecting him to adverse employment actions in retaliation for his protected speech. A jury found in Greisen's favor, and Hanken appeals.

We affirm. We hold: (1) Greisen provided sufficient detail about his speech to establish that it substantially involved a matter of public concern; (2) Greisen spoke as a private citizen rather than a public employee; (3) the district court properly concluded that Greisen's retaliation claim could be based in part on Hanken's own speech acts, in the form of defamatory communications to the media; (4) Hanken waived his argument that his actions were supported by an adequate justification; and (5) sufficient evidence supports the conclusion that Hanken's retaliatory actions proximately caused Greisen's termination, and any error in instructing the jury on proximate cause was harmless. We further hold Hanken is not entitled to qualified immunity.

## I.

Jon Hanken, the former city manager of Scappoose, was responsible for overseeing the city's budget and for annually submitting a budget to the city council for review.[1] According to City Councilor Judi Ingham, Hanken generally

---

[1] We state the facts in the light most favorable to Greisen. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).

submitted his budget to the council soon before the beginning of the budget process, allowing little time for review, and he was defensive about issues relating to the budget. In mid-2012, the city had a particularly contentious budget approval process during which some city councilors advocated unsuccessfully for a budget that would add a police officer to the force. Although Hanken had told Chief of Police Doug Greisen to support the budget at the hearing, Greisen voiced neither support nor dissent. The next day, Hanken told Greisen: "I'm mad at you. You stay on your side of City Hall. I don't want to see you over here." Greisen understood this as an admonition to focus solely on the police department, and to leave the overall city budget to Hanken.

Greisen then learned the city delayed paying police department invoices, sometimes for as long as four months, before the end of the fiscal year on July 1. He became suspicious Hanken was hiding something, and he began asking "a lot of" other people, including the city finance administrator, city councilors and other city department heads, about the city's budgeting practices during the remainder of 2012 and early 2013. He learned the city was withholding payment on invoices from other departments as well. He also learned the city had transitioned from a four-person, on-site auditing team to a one-person, off-site auditing firm, and he was concerned about the differences between the firms: by contrast to the first auditing team, he found that the new auditor was less diligent, was unable to state an opinion on the city's finances and followed different practices that he worried were inconsistent with generally accepted accounting principles. He discussed this issue with the city finance administrator and city councilors. He also took a college course on government budgeting and financial management.

Around August 2012, Greisen tried to meet with Hanken to discuss the budget. Hanken was not receptive; he told Greisen that "Ms. Ingham will be the one that will ruin your career here in the City of Scappoose." He also said Greisen "didn't know what [he was] talking about" when it came to budgeting and financial management.

In early 2013, Greisen was involved in a police pursuit during which he authorized an officer to perform a "PIT maneuver," a method of stopping a fleeing car by bumping it with a patrol vehicle, sending the fleeing car into a spin. Although the maneuver was successful, another officer, Sergeant Doug Carpenter, wrote a memo to his lieutenant alleging it was executed at a high speed without proper procedure. Carpenter's criticism focused on the officer who actually performed the PIT maneuver, but it implicated Greisen's actions as well. The lieutenant forwarded the memo to Hanken, along with his own memo clarifying Greisen's role in the maneuver and recommending an investigation.

Hanken arranged for an outside public agency to investigate Greisen. The investigation's purpose, according to the investigator, was to determine "whether or not there were policy violations," not to weigh whether a policy violation was justified. After interviewing various staff, the agency submitted a 25-page report finding Greisen committed 10 policy violations associated with the PIT maneuver.[2]

---

[2] The violations included the findings that Greisen had: (1) "failed to assume proper and informed control of a police pursuit"; (2) "failed to properly document the pursuit"; (3) "entered into a motor vehicle pursuit with insufficient knowledge and justification"; (4) "engaged in a pursuit,

Upon receiving the report, Hanken suspended Greisen for two weeks without pay. According to the report's author, the subject of such an investigation would "typically" have the opportunity to be heard after the report was complete, but Hanken did not afford Greisen this opportunity. In his suspension letter, Hanken wrote: "As I draft this letter, I cannot help but wonder if you would be able to maintain your position if this report was known by or reported to the news media."

Greisen appealed his discipline to the city's Personnel Review Committee (PRC), which absolved him of wrongdoing. The PRC characterized the outside agency's report as "an erroneous mischaracterization of the events . . . that also purposely omitted pertinent and material facts, to arrive at a conclusion that the PRC finds untenable, out of context and an egregious lack of professionalism." In the PRC's view, the outside agency's report was "not an objective review, but a prosecutorial document that was colored to arrive at a predetermined result." The PRC further found that "the degree of discipline issued to Police Chief Doug Greisen, for minor discrepancies of best practices, is entirely out of proportion based on the totality of the circumstances," and it recommended that "the City

---

operating an unauthorized and improperly equipped police vehicle"; (5) "disregarded policy related to the established procedure for a secondary pursuing vehicle"; (6) "violated safe driving principles related to pursuit driving"; (7) "failed to properly evaluate the need for a continuation of a pursuit"; (8) "demonstrated a lack of knowledge related to applicable standards and police practice related to pursuit intervention tactics and authorized a prohibited tactic by an untrained subordinate officer"; (9) "failed to participate in annual training related to pursuit driving"; and (10) "failed to read and maintain a current working knowledge of his departmental policy manual."

Manager retract, and the Scappoose City Council oversee the retraction [of], all discipline issued to Chief Greisen."

While the PIT maneuver investigation was ongoing, Hanken received another complaint about Greisen from Sergeant Carpenter, this time alleging Greisen had created a hostile work environment. In response, Hanken initiated another investigation by the same outside agency and placed Greisen on indefinite paid administrative leave pending the results of this investigation. Ultimately, the investigation concluded the allegations were not supported by substantial evidence.

In September 2013, while Greisen remained on leave, Hanken informed him the city would conduct a third investigation into his activities. This investigation charged Greisen with unauthorized financial practices relating to $2,500 in donations to the police department that Greisen kept in cash in his office. The investigation, conducted by the same outside agency, found five violations of city policy.[3]

Hanken sent letters to Greisen precluding him from speaking about the three investigations with anyone other than his wife and attorney. Hanken, however, released

---

[3] The investigation found Greisen violated the city's policy by: (1) "having unaccounted for cash in his desk drawer"; (2) "adhering to his own set of rules related to expense reimbursement and submitting reimbursement requests for meal expenses within 25 miles of Scappoose"; (3) "fail[ing] to make bank deposits in a timely manner"; (4) "open[ing] and manag[ing] a bank account to be used as a slush fund for Police Department business and to avoid making purchases through the City's budget process"; and (5) "fail[ing] to donate . . . gift cards (recovered crime evidence) to a charitable organization as requested by the crime victim."

information about all three investigations to the media. In September 2013, soon after Greisen appealed his two-week suspension, Hanken released information about the first two investigations. He admitted at trial that his release of information about the ongoing second investigation "wasn't appropriate."

Similarly, shortly before he resigned as city manager, Hanken spoke to the media about the third investigation, stating "that a bank bag was discovered in the chief's desk and that its contents raised questions about whether the chief was maintaining an unauthorized account." Hanken also said that, "[i]f any other officer had been caught using an unauthorized account, they would have been fired on the spot." He further provided the media with a photo of the cash that he admitted looked like a photo associated with a drug bust or money seizure. Hanken conceded at trial, however, that others in the city knew about the money, that it was associated with authorized accounts and that he spoke to the press to ensure that the second and third investigations he had initiated were not discontinued.

On November 8, 2013, less than a month after the PRC issued its findings that Greisen's discipline for the PIT maneuver was unfounded, Hanken resigned, citing these findings as the reason. He was replaced by Donald Otterman in an interim capacity, and in early 2014 Otterman utilized a "no-cause" clause in Greisen's contract to terminate Greisen, who had not returned from administrative leave. Otterman made his decision after reviewing the investigator's reports and speaking with various people, whose views were highly polarized.

Greisen attempted to find other employment, but was unable to do so. A manager from another city who considered hiring Greisen testified that although he knew

Greisen personally and respected him, he could not hire Greisen as police chief given the negative media attention he had endured.

In 2014, Greisen filed this action. As relevant here, he brought a First Amendment retaliation claim against Hanken under 42 U.S.C. § 1983. Before trial, Hanken moved for summary judgment on qualified immunity, and the district court denied the motion. The claim was tried to a jury, which found in favor of Greisen, awarding him $1,117,488 in economic damages and $3,000,000 in non-economic damages. Hanken filed post-trial motions seeking a new trial on the ground that the district court's jury instruction on causation was erroneous and seeking judgment as a matter of law on other grounds. The district court denied the motions, and Hanken timely appealed.

## II.

We review de novo a district court's denial of a motion for judgment as a matter of law, but "[a] jury's verdict must be upheld if it is supported by substantial evidence, . . . even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). We "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). "'[W]hen reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury,' even if the party did not object to the jury instructions." *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009) (en banc) (alteration in original) (quoting *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001)).

We review de novo a district court's decision on qualified immunity.  *See Elder v. Holloway*, 510 U.S. 510, 516 (1994).  Once the jury has reached a verdict, however, "we must defer to the facts as they were reasonably found by the jury – we do not draw our own inferences from them." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 459 (9th Cir. 2013).

"We review de novo whether [a jury] instruction[] misstated the law."  *Fireman's Fund Ins. Cos. v. Alaskan Pride P'ship*, 106 F.3d 1465, 1469 (9th Cir. 1997).  An error in instructing the jury in a civil case does not require reversal if it is harmless.  *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1087 (9th Cir. 2005).

## III.

A First Amendment retaliation claim turns on a sequential five-step series of questions:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  The plaintiff bears the burden on the first three questions.  *See id.* at 1070–71.  If the plaintiff meets this burden, the burden

shifts to the defendant on the last two questions. *See id.* at 1071–72.   When a constitutional violation has been established, a plaintiff may recover damages that are proximately caused thereby. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1548–49 (2017).   The plaintiff must also establish that the defendant's retaliatory conduct was a but-for cause of the defendant's damages. *See Mendez v. County of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018).

Here, Greisen contends Hanken retaliated against him for discussing the city's budgeting and accounting practices with other city officials.   He contends that this speech involved a matter of public concern – the mismanagement of city finances.   He further contends that his discussions with city officials regarding suspected mismanagement were not part of his job duties, and hence that he engaged in this speech as a private citizen rather than as a public employee. He alleges a number of adverse employment actions – e.g., commencement of the PIT maneuver, hostile work environment and financial mismanagement investigations; the two-week suspension; the indefinite administrative leave; the "gag order" prohibiting him from speaking to the press; and the false and inflammatory information Hanken provided to the press about him – and he contends that his protected speech was a substantial or motivating factor in Hanken's decisions to take each of these actions.   In addition, although he does not contend that Otterman's decision to terminate him was itself retaliatory, he seeks damages arising from the termination on the ground that it was proximately caused by Hanken's retaliatory actions.

Hanken challenges the verdict in favor of Greisen on the first, second, third and fourth of the questions in the sequential analysis.   In addition, he challenges Greisen's

recovery of damages arising from the termination. We address these contentions in turn.

A number of Hanken's arguments also implicate qualified immunity. In resolving whether a government official is entitled to qualified immunity, a court "must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and, if so, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). To determine that a right was clearly established, the court "must identify precedent as of [the date of the alleged violation] that put [the defendant] on clear notice" that his or her actions were unconstitutional. *S.B. v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts must not define clearly established law at a high level of generality. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).

## A.  Matter of Public Concern

With respect to the first step in the analysis, "the plaintiff bears the burden of showing that the speech addressed an issue of public concern." *Eng*, 552 F.3d at 1070.

Whether speech is on a matter of public concern is a question of law, determined by the court, and reviewed by us de novo. *See Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006). The speech need not be entirely about matters of public concern, but it must "substantially involve" such matters. *Johnson v. Multnomah County*, 48 F.3d 420,

425 (9th Cir. 1995). "[S]peech warrants protection when it 'seek[s] to bring to light actual or potential wrongdoing or breach of public trust.'" *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018) (second alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)). The "misuse of public funds . . . [is a] matter[] of inherent public concern." *Johnson*, 48 F.3d at 425.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "[T]he content of the speech is generally the most important." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2012). In reviewing form and context, "we focus on the *point* of the speech, looking to such factors as the employee's motivation and the audience chosen for the speech." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) (citation and internal quotation marks omitted). This analysis seeks to determine whether the employee aimed "'to bring wrongdoing to light,' not 'merely to further some purely private interest.'" *Id.* (quoting *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991)). "[S]peech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

Hanken does not dispute that the potential mismanagement of city funds is a matter of public concern. He argues, however, that he was entitled to judgment as a matter of law on this question on three independent grounds: (1) the district court had insufficient information before it to

conclude the speech involved matters of public concern; (2) the speech did not involve matters of public concern, because Greisen was motivated by a personal grievance against him rather than exposing government wrongdoing; and (3) qualified immunity.

**1.** ***The district court had sufficient information to determine Greisen's speech substantially involved matters of public concern***

Hanken argues the district court lacked sufficient information about the content, form and context of Greisen's speech to conclude it substantially involved matters of public concern. Although Greisen testified about his discussions with other city officials, Hanken contends "he did not describe the substantive content of those conversations in any detail." He contends the descriptions Greisen provided were insufficient "to allow a court to make a determination that [the] speech related to a matter of public concern." *Kurtz v. Vickrey*, 855 F.2d 723, 730 n.4 (11th Cir. 1988); *see also Nixon v. City & County of Denver*, 784 F.3d 1364, 1369 (10th Cir. 2015); *Moss v. City of Pembroke Pines*, 782 F.3d 613, 620–21 (11th Cir. 2015). We disagree.

We agree, of course, that a court must have sufficient information about the content, form and context of speech to determine whether it was on a matter of public concern. A plaintiff, however, need not provide transcriptions of the conversations. Here, Greisen provided enough. With regard to the *content* of the speech, Greisen testified about the discussions he had with the city finance administrator and other department heads regarding Hanken's practice of delaying payment of invoices. Greisen used these discussions, among other things, to learn about how other departments handled invoice payments. Greisen also testified that he discussed his concerns about the new auditor

with some city councilors and with the city finance administrator.  His concerns included the fact that the auditor was not on-site, the auditor's inability to offer an opinion about the city's finances and the quality of the auditor's written reports.  As to *form* and *context*, Greisen provided a general timeline, identified the roles of his interlocutors and described his motivations for the discussions.  The district court, therefore, had enough information before it.

### 2. *The district court properly concluded the speech substantially involved matters of public concern*

Even assuming the information was sufficient, Hanken argues the district court erred by concluding that Greisen's speech substantially involved matters of public concern.  He argues that, even if "the content of the speech does at first glance look like it raises a public concern because it involves the city's finances," "the form and context suggest that the speech is really about a power struggle between plaintiff and defendant – more specifically, about a power play by plaintiff."  Hanken maintains that Greisen's speech "was more like the airing of an internal grievance, the grinding of a private ax, not [an] effort to provoke a public debate on an issue of public concern."

The evidence does not support this contention.  It shows that Greisen was interested in uncovering mismanagement involving city funds.  He spoke to other city officials to learn about the financial management process.  He took a college course on budgeting and finance.  His interest in the welfare of the city is clear from the record.  His family had lived in Scappoose for 30 years, and he "was very involved in the community," where he had "volunteered endlessly."  He also testified he was motivated by "the cop in [him]" to investigate whether something was being hidden.

That Greisen spoke privately to other city officials, rather than publicly, does not show that he was motivated by a private grudge rather than a desire to detect and expose potential mismanagement. The choice "to convey . . . views privately rather than publicly is not determinative of whether . . . expression is entitled to protection." *Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004). Private speech may serve to "bring wrongdoing to light." *Ulrich*, 308 F.3d at 979 (quoting *Havekost*, 925 F.2d at 318).

In sum, the district court properly concluded, based on the "content, form, and context" of Greisen's speech, that his conversations substantially involved a matter of public concern. *Connick*, 461 U.S. at 147.

### 3. *Hanken is not entitled to qualified immunity on the public concern issue*

By 1995, it was clearly established that the misuse of public funds is a matter of public concern. *See Johnson*, 48 F.3d at 425. Given the nature of Greisen's concerns and his longtime connection to the community, Hanken could not reasonably have concluded that Greisen's speech "deal[t] with 'individual personnel disputes and grievances' . . . that would be of 'no relevance to the public's evaluation of the performance of governmental agencies.'" *Coszalter*, 320 F.3d at 973 (quoting *McKinley*, 705 F.2d at 1114). The district court therefore properly denied qualified immunity.

## B. Private Citizen

In a First Amendment retaliation case, the plaintiff also "bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071.

In *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (alterations, citation and internal quotation marks omitted). We look to three non-exhaustive factors to make this assessment: (1) whether "the employee confined his communications to his chain of command"; (2) whether "the subject matter of the communication" fell within the plaintiff's regular job duties; and (3) whether the "employee sp[oke] in direct contravention to his supervisor's order[]." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074–75 (9th Cir. 2013) (en banc). The scope and content of a plaintiff's official duties are questions of fact, but a court must "independently . . . evaluate the ultimate constitutional significance of the facts as found." *Posey*, 546 F.3d at 1129.

## 1. *The district court properly determined Greisen spoke as a private citizen*

Here, viewing the evidence in the light most favorable to Greisen, every *Dahlia* factor favors the jury's conclusion that Greisen spoke as a private citizen. With regard to the first factor (chain of command), the record shows Greisen had conversations with the city finance administrator, city councilors and at least three other department heads, none of whom were within his chain of command.

With regard to the second factor (subject matter), *Dahlia* noted:

> [I]f a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit.

735 F.3d at 1075. Here, Greisen's concerns related to ferreting out "corruption or systemic abuse" in city finances and management, and these functions were not part of his official duties as chief of police. His concerns about the budget related to secrecy and potential wrongdoing: a lack of oversight on the part of the new auditor, Hanken's unwillingness to let anyone into the budgeting process and the failure to pay vendors on time. No evidence suggests these matters fell within Greisen's regular job duties.

With regard to the last factor (contravention of supervisors), there is strong evidence that Hanken, Greisen's supervisor, did not want him discussing or looking into the overall city budget or Hanken's accounting practices. Hanken instructed Greisen to stay on his "side" of city hall, and discouraged him from speaking to Councilor Ingham about the overall budget.

Hanken does not argue that the *Dahlia* factors favor reversal, but attempts to distinguish *Dahlia*, which involved a lower-ranking employee, on the basis that Greisen, as a police chief, had broader duties. *See id.* at 1063. He argues

this case is more analogous to *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), and *Kennedy v. Bremerton School District*, 869 F.3d 813 (9th Cir. 2017). *Poway Unified* held that, "because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers *necessarily* act as teachers . . . when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." *Poway Unified*, 658 F.3d at 968. *Kennedy* held that a school coach acted as a public employee where his job duties "entailed both teaching and serving as a role model and moral exemplar" and he was "acting in an official capacity in the presence of students and spectators." *Kennedy*, 869 F.3d at 827. Hanken contends a police chief, like a teacher, occupies a "position of trust, authority, and responsibility," which means that a police chief is "necessarily acting as the police chief whenever he [is] interacting with other high- and higher-ranking city officials."

We disagree. We have never extended *Kennedy* and *Poway Unified* beyond the school context, and the cases are distinguishable. *Kennedy* and *Poway Unified* focused on the "impressionable and captive minds" to whom the employees at issue espoused their views. *Kennedy*, 869 F.3d at 828 (quoting *Poway Unified*, 658 F.3d at 968). Leading a police force of adults does not implicate the same concerns, so Hanken's analogies to the public school context are unpersuasive.

Hanken also looks to *Moss v. City of Pembroke Pines*, 782 F.3d 613 (11th Cir. 2015). There, the assistant fire chief – who also served as an elected member of the city's pension board – spoke to various employees within his department regarding city-wide pension and wage issues that would

influence the department.  *See id.* at 616–17.  In holding the communications were within the plaintiff's job duties, the court noted the "[p]laintiff's statements . . . were made in accordance with his role as a liaison between the Fire Chief and employees down the chain of command."  *Id.* at 620. Here, by contrast, Greisen spoke outside his chain of command and outside his defined role in the budget process. *Moss* thus does not support Hanken's position.

### 2.  *Hanken is not entitled to qualified immunity on the private citizen issue*

In *Karl v. City of Mountlake Terrace*, 678 F.3d 1062 (9th Cir. 2012), we held that "a reasonable official would . . . have known that a public employee's speech on a matter of public concern is protected if the speech is not made pursuant to her official job duties, even if the testimony itself addresses matters of employment."  *Id.* at 1074 (citing *Garcetti*, 547 U.S. at 421; *Eng*, 552 F.3d at 1075–76; *Posey*, 546 F.3d at 1126–27).  Viewing the record in the light most favorable to Greisen, Hanken told Greisen on two occasions that Greisen was not to concern himself with issues relating to the management of the overall city budget.  No evidence suggests a reasonable official in Hanken's position would have believed analyzing the timing of invoice payments in other departments or city-wide audit practices was within Greisen's job duties.  Hanken is thus not entitled to qualified immunity.

### C.  Adverse Employment Action and Causation

At the third step in a First Amendment retaliation analysis, the plaintiff bears the burden of showing the state took an adverse employment action against the plaintiff and that the plaintiff's speech was a substantial or motivating factor in the adverse action.  *See Eng*, 552 F.3d at 1071.

Thus, to find in Greisen's favor on the First Amendment retaliation claim, the jury had to find Greisen suffered an adverse employment action. "In a First Amendment retaliation case, an adverse employment action is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter*, 320 F.3d at 970. The jury was instructed on several potential adverse employment actions here, including two that involved Hanken's own speech: "misrepresenting . . . accounts to the press as 'unauthorized' before the completion of the investigation; and giving the press access to an inventory photograph that . . . Greisen says was 'inflammatory.'"

Hanken argues the district court should have granted partial judgment as a matter of law on the ground that his communications with the media "do not qualify as adverse employment actions because they involved the exercise of his own free speech rights." Alternatively, he contends he is entitled to qualified immunity on this basis.

"Retaliation claims involving government speech warrant a cautious approach by courts," because "[r]estricting the ability of government decisionmakers to engage in speech risks interfering with their ability to effectively perform their duties" and "ignores the competing First Amendment rights of the officials themselves." *Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016). "[A] balance must be struck between the citizen's right to exercise his First Amendment rights and the public official's personal First Amendment rights, as well as his duty to the public to speak out about matters of public concern." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 n.13 (4th Cir. 2000). Thus, we have on several occasions rejected retaliation claims based exclusively on retaliatory speech, noting that "[i]t would be the height of irony, indeed, if mere speech, in

response to speech, could constitute a First Amendment violation." *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998); *see also Mulligan*, 835 F.3d at 989–91; *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994).

We have, however, held that retaliatory speech can serve as a basis for liability for a First Amendment retaliation claim under at least two circumstances.

First, a First Amendment retaliation claim may be based on retaliatory speech when that speech is part of a campaign of harassment designed to burden the plaintiff's protected expression. In *Allen v. Scribner*, 812 F.2d 426 (9th Cir. 1987), for example, the plaintiff alleged "he was the subject of continued harassment designed both to prevent him from voicing his opinion and to punish him for his having already done so." *Id.* at 429. Specifically, he alleged the defendants intimidated him, threatened him, harassed him and "made defamatory statements to the media with the intent of discrediting him." *Id.* In addition, he alleged he was transferred in retaliation for his protected speech. *See id.*

We rejected the defendants' argument that "any allegation of harassment grounded in a claim of defamation" was not actionable. *See id.* at 434 n.17. We accepted the proposition that, "to establish a claim under § 1983, more must be involved than defamation by a state official." *Id.* But that principle was inapplicable to the facts of the case: "Here, something more *is* involved. [The plaintiff] alleges that the defamation he suffered was part of a concerted effort to burden his first amendment expression." *Id.*; *see also Coszalter*, 320 F.3d at 975–77 (citing *Allen* and holding that "engaging in [a] campaign[] of harassment and humiliation" can be the basis for liability in a First Amendment retaliation claim).

Second, even when it is not part of a campaign of harassment designed to burden the plaintiff's protected expression, retaliatory speech may serve as the basis for a First Amendment retaliation claim when it "intimat[es] that some form of punishment or adverse regulatory action would follow." *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003)); *see Goldstein v. Galvin*, 719 F.3d 16, 30–31 (1st Cir. 2013); *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011); *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 417 (4th Cir. 2006); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999); *see also Mulligan*, 835 F.3d at 989 n.5 (rejecting the proposition that "speech by government officials can never give rise to a claim of First Amendment retaliation," *id.* (emphasis omitted), and explaining that "informal measures, such as the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation, can violate the First Amendment," *id.* (internal quotation marks and alteration omitted) (quoting *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000))).[4]

This case falls squarely within *Allen*.  As in *Allen*, Greisen's retaliation claim involves something more than defamation by a public official.  He alleged the defamation he suffered was part of a concerted effort to deter him from, and punish him for, engaging in constitutionally protected speech.  He alleged Hanken engaged in a campaign of harassment against him that included not only defamatory communications with the press but also a suspension, an

---

[4] We have left undecided the question of whether retaliatory speech may also be actionable in some circumstances when it involves the "disclosure of deeply private personal details."  *Mulligan*, 835 F.3d at 990; *see also Balt. Sun*, 437 F.3d at 417; *Bloch v. Ribar*, 156 F.3d 673, 676 (6th Cir. 1998).

indefinite leave, a one-sided gag order and the instigation of three spurious investigations. Greisen thus permissibly premised his retaliation claim in part on Hanken's communications with the media. In addition, Hanken is not entitled to qualified immunity on the theory that he would not reasonably have known at the time of his actions that a First Amendment retaliation claim could be based in part on acts of retaliatory speech. In light of *Allen*, decided in 1987, he was on notice.**[5]**

## D.  Adequate Justification: *Pickering* Balancing

"[I]f the plaintiff has passed the first three steps, the burden shifts to the government to show that under the balancing test established by *Pickering*, the state's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071 (alterations and internal quotation marks omitted). "This inquiry, known as the *Pickering* balancing test, asks 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418); *see Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Hanken seeks to raise this defense here, but "an appellate court will not consider issues not *properly* raised before the district court." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (emphasis added). Here, Hanken briefly asserted this argument for the first time in his reply brief on his

---

**[5]** Because this case falls squarely within *Allen*, we need not determine whether Hanken's communications with the media also intimated that some form of punishment or adverse regulatory action would follow. *See Brodheim*, 584 F.3d at 1269-71.

renewed motion for judgment as a matter of law, and the district court appropriately declined to consider it. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").**6**  The argument, therefore, is waived.

Hanken argues the question is "purely one of law," which could allow us to exercise discretion to review the argument under *Bolker v. Commissioner of Internal Revenue*, 760 F.2d 1039, 1042 (9th Cir. 1985). We disagree. Although the *Pickering* balancing test "is ultimately a legal question, . . . its resolution often entails underlying factual disputes." *Eng*, 552 F.3d at 1071. Here, the record is undeveloped. It is thus inappropriate to review Hanken's argument under the pure question of law exception because we "cannot rule out the possibility that . . . the merits of the . . . argument cannot be resolved without further hearings before the district court." *A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 339 (9th Cir. 1996).

### E.  Damages

As noted, Greisen did not argue that his termination was an adverse employment action. He argued, however, that it

---

**6** Although Hanken briefly alluded to *Pickering* balancing in his opening brief in support of his Rule 50(b) motion, this cryptic allusion was insufficient to raise the issue. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) (an argument is properly raised below when it is "raised sufficiently for the trial court to rule on it" (quoting *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989)). Because the issue was waived for this reason, we need not consider other possible bases for waiver. *See, e.g.*, *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

was proximately caused by Hanken's actions. He therefore sought damages arising from his termination.

Hanken challenges these damages. Quoting *Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 804 (9th Cir. 2009), he contends his conduct did not proximately cause Greisen's termination, because Otterman, Hanken's successor, "made a wholly independent, legitimate decision to discharge" Greisen, and any reasonable jury would have so found. Alternatively, he asks us to remand for a new trial because jury instruction number 17 misstated the law of proximate cause by failing to require a direct relation between Hanken's actions and Greisen's termination. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) ("Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" (alteration in original) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010))). This failure, in his view, prevented the jury from considering whether Otterman's decision to terminate Greisen severed the chain of causation. We address these contentions in turn.

### 1. *Substantial evidence supports the jury's conclusion that Hanken's actions proximately caused Greisen's termination*

We are not persuaded by Hanken's argument that any reasonable jury would have concluded that his actions did not proximately cause Greisen's termination. The Supreme Court considered an analogous issue in *Staub*. There, the plaintiff, a member of the United States Army Reserve, brought a claim under the Uniformed Services Employment and Reemployment Rights Act, claiming his employer discharged him as a result of his military obligations. *See id.*

at 415. The plaintiff's biased supervisor had reported the plaintiff to a superior, who reviewed the plaintiff's file and fired him partially on the basis of the supervisor's report. *See id.* at 414–15.

The Court framed the question before it as whether "an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Id.* at 413. Answering this question required the Court to consider whether "the biased supervisor's action" was "a proximate cause of the ultimate employment action" – the precise question at issue here. *Id.* at 420, 422. The proximate cause inquiry, in turn, hinged on whether the biased supervisor's actions "were causal factors underlying [the] decision to fire" the plaintiff. *Id.* at 423. The Court explained:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

*Id.* at 421.

Under *Staub*, the question is whether Hanken's actions were a "causal factor" in Otterman's decision to fire Greisen – i.e., whether Otterman fired Greisen "for reasons unrelated to [Hanken's] original biased action[s]." *Id. Compare Lakeside-Scott*, 556 F.3d at 807–09 (holding that a biased

supervisor's actions, including initiating an investigation that led to the plaintiff's discharge, were not causal factors in the plaintiff's discharge where the ultimate termination decision was based on a thorough investigation that was independent of the supervisor's improper influence), *with Poland v. Chertoff*, 494 F.3d 1174, 1182–84 (9th Cir. 2007) (holding that a biased supervisor's actions were causal factors in the plaintiff's transfer where the employer failed to shield the disciplinary inquiry from the supervisor's influence, the supervisor played a role in selecting witnesses for the inquiry and the supervisor's memo that initiated the inquiry was available to the disciplinary board making the ultimate transfer decision).

Here, the evidence does not show that Otterman's decision was "unrelated to" Hanken's conduct. *See Staub*, 562 U.S. at 421. Hanken points to Otterman's testimony that his decision was based on the results of the three investigations Hanken initiated. There is some reason to doubt that these investigations were independent. Hanken selected the outside agency that performed the investigations, and, more strikingly, he admitted at trial that when he learned that the city council was considering ending the investigations, he made a false report to the media in a seemingly successful effort to keep them going.

Even assuming, however, that the investigations were fully independent and that Hanken cannot be held responsible for what they uncovered, *cf. Lakeside-Scott*, 556 F.3d at 806–07, they are not the whole story. Otterman acknowledged that there were "some other things" motivating his decision, including the negative media attention surrounding Greisen and the fact that "the police department employees felt that they could no longer rely on . . . Greisen as the chief of police." Hanken's wrongful

actions – which amounted to a campaign of public humiliation through, among other things, false and misleading representations – almost certainly played a direct and substantial role in creating or exacerbating these conditions. Otterman did not assert that he made any effort to shield his termination decision from the influence of Hanken's actions. *Cf. Poland*, 494 F.3d at 1183. And there is no contemporaneous evidence that Otterman's decision was based solely on the investigation results. On the contrary, rather than identifying a particular justification for the dismissal – like the employer did in *Lakeside-Scott*, 556 F.3d at 809 – he concluded "that the best situation for the City was to exercise the, quote, 'no-cause,' unquote, clause" in Greisen's contract. Otterman further made clear that Hanken's actions created an environment of unrest that framed and dictated the timeline of the decision:

> There were several articles about [Greisen] and about what was going on in the City. . . . The police chief was on administrative leave. And that causes commotion or turmoil in the organization and needs to be resolved as soon as possible.

On this evidence, a reasonable jury could have found that Hanken's actions were a causal factor in Otterman's decision.

### 2. *Any error in the jury instruction on proximate cause was harmless*

As noted, Hanken argues he is entitled to a new trial because jury instruction number 17 misstated the law of proximate cause by failing to require a direct relation between Hanken's actions and Greisen's termination. In relevant part, that instruction stated:

You can award money only for those damages that arise naturally and necessarily from the violation of law that the Plaintiff has proven. . . .

If you find that the Defendant wrongfully retaliated against the Plaintiff in violation of the Plaintiff's constitutional rights, and if you also find that it was reasonably foreseeable that such wrongful retaliatory conduct, if any, by the Defendant would render the Plaintiff unable to maintain either his position or his salary (either at the City of Scappoose or at another employer), then you may award the Plaintiff any non-speculative, foreseeable economic damages caused by the Defendant's wrongful retaliatory conduct.

We need not determine whether jury instruction number 17 was erroneous because any error was harmless. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017) ("Where 'it is more probable than not that the jury would have reached the same verdict had it been properly instructed,' the erroneous instruction is harmless." (quoting *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009))).

As described above, the evidence here strongly supports the conclusion that Otterman's termination decision was influenced by Hanken's retaliatory actions. Even fully crediting Otterman's testimony, he acknowledged that the media attention and Greisen's recent reputation in the department – almost certainly influenced by Hanken's actions – played a role in his termination decision. Otterman further admitted that Hanken's actions had placed the city in

turmoil, which he felt "need[ed] to be resolved as soon as possible." He did not provide formal reasons for the termination but rather used a "no-cause" provision in Greisen's contract. *Cf. Lakeside-Scott*, 556 F.3d at 809. Nothing in his informal review process shielded Otterman from the influence of Hanken's actions. In sum, the evidence strongly suggests Hanken's actions were a causal factor in Otterman's termination decision, and thus it is more probable than not a jury would have so found.

Moreover, the instructions required the jury to find that any damages arose "naturally and necessarily" from Hanken's unlawful conduct. It would be illogical for a jury to find that Otterman's decision to terminate Greisen followed naturally and necessarily from Hanken's adverse employment actions, but nevertheless was unrelated to those actions.[7]

We thus hold that any error in jury instruction number 17 was harmless because it is more probable than not that the jury would have reached the same result had it been instructed as Hanken argues.

## IV.

The district court properly denied Hanken's renewed motion for judgment as a matter of law and motion for a new trial. The judgment of the district court is therefore affirmed.

**AFFIRMED.**

---

[7] We do not endorse the "naturally and necessarily" instruction or imply that it correctly stated the applicable law in this case.